FARRAND v. HOUSTON & T. C. R. CO.
(No. 7609.)

(Court of Civil Appeals of Texas. Galveston. June 24, 1918. Rehearing Denied Oct. 10, 1918.)

1. NEGLIGENCE ⬤⟿135—CONTRIBUTORY NEGLIGENCE OF CHILD—SUFFICIENCY OF EVIDENCE.

In a personal injury action, evidence *held* sufficient to sustain jury's special finding that the injured boy had sufficient intelligence to appreciate, and sufficient discretion to avoid, the danger from which the injury resulted.

2. WITNESSES ⬤⟿269(12) — CROSS-EXAMINATION OF CHILD—MENTAL CAPACITY.

Upon a question of contributory negligence of a boy injured by purposely exploding a dynamite cap while playing on defendant's property, evidence, on his cross-examination, as to what he knew and had been told in the matter of taking or meddling with others' property was relevant on the question of intelligence and discretion, particularly where plaintiff offered evidence of the · boy's brightness and average record in school.

3. EVIDENCE ⬤⟿272—DECLARATION AGAINST INTEREST.

Evidence that plaintiff, suing for personal injury, stated soon after injury that it was his fault, and he blamed no one therefor, was admissible as a declaration against interest.

4. NEW TRIAL ⬤⟿143(2) — GROUNDS — IMPEACHMENT OF VERDICT—ANSWERS TO INTERROGATORIES—"MISCONDUCT OF JURY."

Rev. St. 1911, art. 2021, permitting testimony of jurors in open court to impeach their verdict for "misconduct of jury," would not include reception of testimony to show that jurors did not understand the legal effect of their answers to special interrogatories.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Misconduct.]

Error from District Court, Harris County; Henry J. Dannenbaum, Judge.

Suit by Wallace Farrand, by next friend, W. W. Farrand, against the Houston & Texas Central Railroad Company. Judgment for defendant, and plaintiff brings error. Affirmed.

Presley K. Ewing, of Houston, Ewing Werlein, of New Orleans, La., and L. E. Blankenbecker, of New York City, for plaintiff in error. Baker, Botts, Parker & Garwood and McMeans, Garrison & Pollard, all of Houston, for defendant in error.

GRAVES, J. This admittedly correct statement of the nature and result of the suit, very slightly changed, is taken from plaintiff in error's brief:

"Wallace Farrand, a minor, by his father, W. W. Farrand, as his next friend, sued the Houston & Texas Central Railroad Company to recover damages for personal injuries sustained by him, including the loss of his eye, when he lacked one and a half months of being 13 years of age, from the explosion of a dynamite cap that the defendant, it was alleged, had negligently left exposed in an unlocked locker on its premises, which had been made unusually attractive to children of the age and intelligence of plaintiff by the presence there of a steam shovel and appurtenances, whereby plaintiff, following a childish instinct, had been caused to go upon the premises and explode the dynamite cap, when he was, on account of immaturity of age and discretion, without sufficient intelligence and discretion to appreciate and avoid the danger of his act in doing so. The defendant answered, so far as material to state, by general denial, and by plea of contributory negligence. Final judgment was rendered that the plaintiff take nothing, and that the defendant go hence without day with its costs, upon the special verdict of the jury, which found, so far as necessary to state: (1) That the steam shovel in question was unusually attractive to persons of plaintiff's age and intelligence at the time of the injury; (2) that plaintiff was induced by such peculiar attraction to go to and onto the steam shovel on the occasion in question; (3) that the defendant, Houston & Texas Central Railroad Company, was negligent in leaving the locker containing the explosive caps unlocked on such occasion; (4) that such negligence was a proximate cause of the injuries then received by plaintiff; (5) that plaintiff on the occasion in question did have sufficient intelligence to appreciate, and sufficient discretion to avoid, the danger of his act in exploding the cap in the manner he did; (6) that the plaintiff's act in so exploding the cap, considering his age and discretion at the time, was not such as a similar person of ordinary prudence would have done; (7) that the sum of money paid at the time of the trial which would fairly and adequately compensate plaintiff for the alleged injuries suffered by him on the occasion in question, taking into consideration exclusively as elements of damage mental anguish, physical suffering, the reasonable value of necessary medical attention and treatment, and the reasonable value of his diminished capacity to labor and earn money after arriving at 21 years of age, was $4,000."

The case is regularly here upon appeal by the injured boy through writ of error.

It will be noted that the jury found all issues in the boy's favor, except as to the sufficiency of his intelligence to appreciate, and of his discretion to avoid, the danger, and as to the exercise of proper care, both of which were found against him, causing the adverse judgment.

After conceding, with characteristic candor, that opposing counsel had successfuly answered their second assignment by showing the testimony there excluded to have been in substance elsewhere admitted, counsel for plaintiff in error then very ably contend, through a number of other assignments, that reversible error was committed below in three particulars:

(1) In admitting, over objection of irrelevancy, testimony of both Wallace and his father that the boy had gone to Sunday school and church, and prior to his injury had been taught there and at home that it was wrong to interfere, meddle with, or take other people's property, and of the boy alone that at the time of the injury he knew it was wrong to do these things.

(2) In ruling as relevant to the jury on the issues, over objection that the same was incompetent as a conclusion or opinion, testimony that the boy Wallace, in talking the matter over after he was injured, stated

that he did not blame anybody, that it was his own fault.

(3) In the refusal of the trial court to then reassemble and in open court examine the jury as requested by plaintiff in error in his motion there for a new trial, in response to his allegations therein made that—

"the verdict was the result of misconduct and mistake on the part of the jury, in that a considerable number of them, probably half or more, in fact believed from the evidence that plaintiff did not have intelligence and discretion, at the time he exploded the cap and was injured, to appreciate and avoid the danger of his act, and that his act in exploding the cap was such, considering his age and discretion, as a similar person of ordinary prudence would have done under like circumstances, and agreed to a contrary finding on each and both of the issues submitting these questions, namely, special issues Nos. 7 and 8, as returned, because they believed and were under the mistake that the plaintiff, regardless of the answers as returned to such issues, would recover and get the damages found by them, to wit, $4,000, and they would not otherwise have agreed to such findings, or either of them, as returned in answer to the special issues Nos. 7 and 8, as shown by the accompanying affidavit of the jurors hereto attached, marked Exhibit A, and prayed to be taken as a part hereof."

Since the three questions thus presented comprehend all the issues raised, in disposing of them in like order it is not thought essential that further reference eo nomine be made to the assignments.

In the main and as a basis for consideration of each of the three questions presented, what are deemed the salient facts surrounding the injury to the boy may be thus epitomized:

The scene of the accident, and the location of the steam shovel which furnished the alleged attraction to him and his boy associates on this occasion, Sam Tait, Charles Henderson, and Will Hobbs, was out in the country on the "Eureka Cut-Off" Railway line, then under construction by defendant in error, in which work it was using the steam shovel at a point thereon about six miles from Houston and about two miles from Sam Tait's house. Wallace Farrand, who lived in Houston, was spending the week-end at young Tait's house, and on Sunday, March 15, 1914, he and the other three boys named, the first two being about his age, and Hobbs some years older, after taking dinner together at the home of Charles Henderson's parents, which was likewise about two miles from the steam shovel, went to where it was to investigate and look it over. The shovel was on the railroad right of way out in the woods, the nearest house to it, from three-fourths of a mile to a mile away, being that of the watchman whom the railroad company had left in charge of it for that day, but who had gone home and was not at the shovel when the boys visited it. On arriving there, after playing around the shovel awhile, and greasing up the chains, handholds, seats, etc., the boys then went to the cabinet or locker on the engine of the steam shovel, the doors to which were shut but not locked, opened these doors, and found on the inside a Prince Albert tobacco can, which they likewise opened, and found to contain some dynamite or detonating caps. With none of the boys undertaking to say which particular one first did so, they took these caps out, each one having some, and tried to explode them, first by throwing them against the boiler on the steam shovel, but, failing in that, then took them down the track from 100 to 300 yards to a flat car, where they continued trying to explode them in various ways, by throwing them at the iron wheels of the car, at telephone poles, and by laying them on the rails of the track and throwing rocks down on them from the flat car. Will Hobbs, the oldest of the boys, who was 15, even put one of the caps on a brake band and pulled the lever, still without success. There was no one present during all this except the four boys. Finally, Wallace Farrand took one of the caps, and, saying that he would explode it, got up on the flat car and laid it upon a piece of iron, took a monkey wrench he found there, and hit it two or three times, when it exploded, causing the injuries complained of.

So far there are no material differences in the versions of the four boys, all of whom testified upon the trial, but in further details their statements diverge to this extent: The injured boy, while admitting that the other boys told him when he first got them they were dynamite caps, denied that they further told him the caps were dangerous, or that he knew that fact, saying that Will Hobbs merely told him his brother had exploded a cap and it did not hurt him. In these statements he was corroborated by Sam Tait, who, however, admitted that something just told him to get out of the way, and he got behind something for safety first; while, upon the other hand, the oldest boy, Will Hobbs, testified:

"Wallace finally exploded one with the wrench. He got up on the car there, and he just hit it with the wrench. He was attempting to explode it when he hit it, and we boys got out of the way; we got up around the machinery there. We got out of the way and behind the machinery because we were scared of it; we didn't want to get hurt with it. When he was doing that I just said, not only to him, but to all of them, that they would hurt him if it exploded. I didn't say anything to Wallace about these dynamite caps not hurting them if they exploded; that wasn't dynamite caps I was talking about then; it was caps for a short gun shell. I told them I had seen my brother explode dynamite caps with a fuse."

Charles Henderson, after stating that while Wallace was hitting the cap the rest of the boys were trying their best to get out of its way, then corroborated Hobb's testimony as follows:

"Hobbs told us all about it, and what it would do if it exploded; he told us that at the steam shovel when we got them there. Wallace Farrand was there when he told that. * * *

When we first got the caps Hobbs told us about his brother-in-law discharging them on different days, like the Fourth of July, and he told us that he generally put them in a tin can and attached a fuse to it, and in that way they used them instead of firecrackers. He told us that it was liable to hurt us very much if we was to discharge one and be close to it. He told us that before Wallace discharged this one."

In his own behalf Wallace had testified that just before his injury he was in the fifth grade in school, was making good grades, and was not a dull, ignorant boy for his age, but was an average boy. His father amplified upon his son's habits, qualities, and degree of mental and physical development as follows:

"As to Wallace's habits as to industry, steadiness, and obedience, he was a boy who had never given us any trouble. He was just an average boy. He never had given us any trouble to speak of. His health was fine. Physically, he was fine."

With the general body and substance of the proof in the condition thus given, upon cross-examination of the boy and his father, their further testimony that the boy knew and had been taught that it was wrong to interfere with other people's property, etc., first above complained of as error, was then elicited; likewise, and under the same general state of the evidence, as is next in order assigned as constituting reversible error, Charles Henderson, on direct examination, was permitted to testify that Wallace Farrand, after being hurt, told the other boys "it was all his fault"; and, solely for the purpose of impeachment of Wallace's prior testimony that he had not made that statement to Will Hobbs, the court permitted Hobbs to be put back on the stand, after the plaintiff in error had closed his testimony in rebuttal, and to testify that after the explosion he heard Wallace say he didn't blame anybody, that it was his own fault.

The facts concerning the court's refusal to reassemble the jury upon motion for new trial, which action is alleged to have constituted the third error as above enumerated, have been sufficiently set out in our statement of the contention made thereon, and need not be repeated.

[1, 2] We are unable to hold that reversible error was committed in any of the respects insisted upon. There was, we think, ample support in the evidence for the jury's finding that this boy did have sufficient intelligence to appreciate, and sufficient discretion to avoid the danger of exploding the cap, under the circumstances shown, and that he was guilty of negligence in so doing. Under our authorities, the real question, as the court in this instance properly charged, was one as to the capacity of the boy to understand and appreciate the danger of his act. Ry. Co. v. Lawrence, 197 S. W. 1020, and authorities cited on page 1022. That being true, the facts brought out on cross-examination as to what he knew and had been taught with reference to taking, meddling, or interfering with property belonging to other people had equally as relevant bearing, it seems to us, upon the question of his intelligence, discretion, and general capacity to understand and appreciate the danger of a given situation, as did those other facts he himself voluntarily offered, such as his being nearly 13 years old, and not being ignorant and dull, but an industrious, obedient, and steady boy of average brightness for that age, in fine health and physical condition, and making a good average record in the fifth grade at school. Indeed, we are not prepared to say it was not admissible on the question to which the state of the boy's progress toward maturity in intelligence and discretion had relation; that is, the negligence of the railroad company. Its negligence depended upon whether or not, in the detailed circumstances here recounted, it could reasonably be held to have anticipated that such consequences as were in this instance alleged would probably result from its leaving the steam shovel without a watchman, and the locker thereon, containing the can with the explosive caps inside, unlocked on the occasion in question. That action could hardly be said to have constituted negligence toward an adult, when the steam shovel itself was on the railroad right of way out in the woods, well-nigh a mile from any house, on Sunday, the caps being stowed away in the bottom of a covered tobacco can, placed inside a closed locker upon one of the company's cars. In fact, the plaintiff in error impliedly so recognizes in predicating his right of action solely upon his claimed immaturity; and, if it would not have been negligence toward one of mature age and discretion, how far toward that state of development must one have progressed before it would have been such as to him? That very question was what the jury here were necessarily called upon to determine, and can it be properly said that this boy's knowledge and training as to the wrongfulness of the very things he had so done in bringing this injury upon himself would have furnished them no aid whatever in gauging his capacity and intelligence, and, upon that as a basis, in further saying whether the railroad company should have anticipated that one such as he would probably do and suffer the very things he did? We think not, especially when the boy himself had seen fit, upon direct examination, in tendering the issue that he was without the requisite degree of intelligence and discretion, to make profert of his mental and physical development in the manner already recited, and the matter now complained of was only brought out on cross-examination, the very means afforded for thoroughly testing the reaches of his mind and the limits of his ability and capacity to both understand and appreciate the hazard of what he was doing.

If, however, it could be rightly said that

this testimony went beyond the legitimate scope of cross-examination, and neither tended to throw any light whatever upon the question of the boy's capacity, nor upon the duty owing to him by the railroad company, nor was for any other purpose admissible, then we do not think it was of such a nature that this court could say it probably caused the jury to find that he did have the requisite degree of intelligence and discretion.

[3] The relevancy of the other testimony complained of, that to the same effect of both Charles Henderson and Will Hobbs as to Wallace's statement about not blaming anybody, that it was his own fault, under the recited conditions of its admission, does not seem to us a matter of serious doubt. The main objection below, and the only one insisted upon here, is that it amounted to a mere conclusion and not the statement of any fact. With this deduction, however, we are not inclined to agree, but rather think, in the light of all the facts and circumstances present here, the same thing might be said of this boy as was said of the engineer in Hovey, Receiver, v. See, 191 S. W. 607:

"The declarant stated that he did not blame anybody for the accident, thereby, in effect, saying that he absolved any other party from blame; and it was not a matter of opinion, because he knew whether or not anybody was to blame for the accident."

Under that view, the statement was admissible as a declaration against interest. Authorities cited under paragraph 1, Hovey v. See, supra. Moreover, we think it was clearly competent when offered in rebuttal for impeachment purposes through the witness Will Hobbs.

[4] Finally, in assailing the court's refusal to reassemble and examine the jury, it is urged that the matter presented as ground therefor was sufficient for a new trial, if proved, under our present statute (R. S. art. 2021). As the bill of exception shows, the trial court declined the request,

"on the ground that the matters set out in said affidavit, if true, were contradictory to and impeached the answers of the jury, including said affiants, to the special issues submitted to them, which answers in writing were returned into open court by said jurors as their verdict in said cause; the members of the jury, including said affiants, at the time when said verdict was received and read in open court, in answer to a question by the court, stated to the court that said answers were their verdict in said cause."

In other words, while the strictly proper practice was doubtless followed in seeking convocation of the jury in order to get their oral testimony, and in then assigning error upon the court's refusal to accord that rather than upon its denial of a new trial because of misconduct, since a new trial could not be granted on that ground upon mere affidavits of the jurors, still the practical effect of the court's conclusion and action was the same as if it had in open court heard their oral testimony to the matter contained in the affidavits, and in the exercise of its discretion, had refused the new trial on account of it. We think no abuse of the discretion vested under the article invoked is shown, for such is at last the real question in this court concerning the course pursued below. Ry. Co. v. Geary, 194 S. W. 458; Ry. Co. v. Gray, 143 S. W. 606, 105 Tex. 42. As expressive of our own view upon the issue raised, conscious of inability to improve upon it, we take the liberty of quoting this clear-cut comment from the brief of defendant in error:

"Counsel for appellant concede that prior to the adoption of article 2021 (in 1905) neither the affidavits nor testimony of jurors as to their conduct would be received to impeach the verdict, but insist that since the adoption of the article their testimony as to misconduct will be received. We have no quarrel with either of these positions. That the rule of the common law was changed against allowing jurymen to come into court, either by affidavit or oral testimony, and to show that they were guilty of such misconduct during their deliberations as that their verdict in justice to the losing litigant should be set aside, cannot now be questioned. But our position is that the statute in question, although changing the rule as it exists at common law, as above indicated, does not permit a juryman, either by affidavit or by testimony in open court in support of a motion for a new trial, to say that the verdict returned by him on special issues, under his oath, and received by the court as his verdict, did not in fact reflect his convictions, but was rendered by him in the way it was because he did not know the meaning of an unambiguous charge, or did not know the legal effect of the answers he made. The fact that one juryman— or six, for that matter—did not understand the legal effect of their answers to special issues Nos. 5 and 6, wherein the jury answered that plaintiff had sufficient intelligence to appreciate, and sufficient discretion to avoid, the danger of his act in exploding the cap in the manner he did, and that such act, considering his age and discretion at the time, was not such as a similar person of ordinary prudence would have done, and made their answers contrary to their convictions on that issue, was not 'misconduct of the jury,' as that phrase is ordinarily understood, nor as meant by the lawmakers in the adoption of the article."

In fact, we think this court has heretofore gone on record in the same construction of this new statute in Hermann v. Schroeder, 175 S. W. 789. True, the facts there were not just such as appear here, but the court went far enough to indicate its view that the statute should be so construed, and we are not inclined to now state a different one.

These conclusions require the overruling of all assignments and an affirmance of the judgment, which order has been entered.

Affirmed.