Mrs. Adelle HULLUM, Administratrix, et al.,
Appellants,

v.

ST. LOUIS SOUTHWESTERN RAILWAY
COMPANY, Appellee.

No. 67.

Court of Civil Appeals of Texas.

Tyler.

Nov. 5, 1964.

Rehearing Denied Dec. 3, 1964.

George L. Schmidt, Schmidt & Garrett, Houston, McLendon & Tyner, Tyler, for appellants.

Jack W. Flock, Ramey, Brelsford, Hull & Flock, Calhoun & Clark, Tyler, for appellee.

MOORE, Justice.

This suit was instituted by Adelle Hullum, Individually and as Temporary Administratrix of the estate of her deceased husband, J. T. Hullum, and also as Guardian of Richard Sidney Hullum and Cynthia Ann Hullum, seeking damages for the alleged wrongful death of J. T. Hullum under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. Upon trial of the cause, the jury returned a verdict for the defendant, St. Louis Southwestern Railway Company, and based upon the verdict the court entered a take-nothing judgment and the plaintiffs, hereinafter designated as Appellants, perfected this appeal.

As a basis for their cause of action, Appellants alleged in their pleadings that the injuries and resulting death sustained by the plaintiffs' decedent were caused by the failure on the part of the agents, servants and employees of the railroad to exercise due care for his safety in each of the following particulars: (1) in failing to furnish decedent with a safe place to work; (2) in failing to keep a proper lookout for decedent on the occasion in question; (3) in moving the cars at a speed in excess of that which an ordinary prudent person would have moved same; (4) in kicking the cars in question harder than a person of ordinary prudence would have kicked same; (5) in kicking the cars without having first determined that decedent was in a safe position aboard the car he was riding; and (6) in kicking the cars in question on a downgrade, all of which acts were alleged to be a proximate cause of the injuries and resulting death of J. T. Hullum. Appellee St. Louis Southwestern Railway Company denied the allegations and plead contributory negligence and unavoidable accident.

The evidence shows that at the time of the accident Appellants' decedent, J. T. Hullum, was a member of a switching crew working at his assigned duties with Appellee St. Louis Southwestern Railway Company at Appellee's Tyler, Texas, yard. On the morning of December 13, 1961, the railroad's company crew was engaged in a switching operation which, in the railroad industry, is commonly referred to as "kicking cars," which was shown to be a customary type of operation. In this type of operation the switch engine would push a number of cars forward until enough momentum was gained that the cars would move under their own power, at which time the switch engine would be slowed and the cars would be "cut" or "kicked" loose from those remaining attached to the switch engine, and would then roll on to the different side track to their previously designated location where the cars would then be stopped or "spotted" by a member of the switching crew by the use of a handbrake. It was the duty of the decedent, J. T. Hullum, to ride the various "kicked" cars to their designated location and to set the handbrake at the proper "spot." Just before the occurrence in question, cars were being switched out of Track No. 6; one car had been kicked, unmanned to Track 11; one car had been kicked, unmanned to Track 8; one car had been kicked to Track 6, on which switchman C. R. Strother rode to apply the brake, and then six cars were kicked to Track No. 9 on which Hullum was to ride and set the brake.

According to the testimony of C. R. Strother, a member of the switching crew, he was looking directly at Hullum when the accident happened. He testified that he saw

Hullum mount the rear end of the leading box car and again observed him when he got to the top of the car. He then observed Hullum to take about three or four steps forward and then turn around and face the engine, appearing to have braced himself. That although it is the usual practice in the Tyler yard for the engine to stop after a kick has been made, the engine did not stop on any of the previous kicks and did not stop before kicking the cars on which Hullum was riding. According to his testimony, the switch engine kicked the cars out from under Hullum and he fell down between the cars. He testified that immediately thereafter he left the car which he was riding and went upon one of the cars on which Hullum had been riding and applied the handbrake and stopped the cars; he then went to Hullum and found him to be underneath one of the cars, but outside the track; that he was approximately 55 to 60 feet from the place where he fell between the cars, was bleeding profusely and seemed to be injured in the shoulder and appeared to have been dragged by the cars. An ambulance was called and he was immediately hospitalized.

He further testified that at the point where Hullum fell from the car, the grade of the track descended in the direction in which the cars were moving, and that under such circumstances it is not ordinarily necessary to kick the cars because they will move under their own momentum; that it was the usual custom in Tyler yard for the engine to kick the cars and then stop before kicking other cars, but on this occasion the switch engine did not stop before kicking the cars upon which Hullum was standing. However, the kick was accomplished in an ordinary manner and there was no rule or regulation requiring the engine to stop before kicking. According to his testimony, it is the duty of the engine foreman to see that his men are in a safe position before kicking movements are made.

L. C. Foster, another member of the switching crew, testified that he had pulled the pin to cut loose the six cars on which Hullum was riding, and that there remained eleven cars between him and the switch engine at that time. He testified that the side tracks were so arranged that it was not necessary for the switch engine to stop in order to make the previous kicks on the side track, but same could be accomplished by bumping or kicking the cars and then slowing down; that this was the method used on this occasion; that Mr. W. B. Bradley gave the kick signal at which time the cars were traveling three or four miles an hour; that he did not know the whereabouts of Hullum at that time and did not see him fall.

The engineer, C. H. Bivins, testified that at the time of the incident the switch engine was proceeding between three and four miles an hour on a descending grade; that upon receiving the kick signal from Bradley, he momentarily accelerated the throttle so that the sudden thrust of power from the engine would bump the cars together so that the tension on the pin connecting the coupling between the cars could be released, permitting the pin to be pulled so that the cars could be uncoupled as they moved down the track; that the momentary acceleration of the throttle would have probably increased the speed of the engine to seven or eight miles per hour had the acceleration been maintained. He testified that he did not see Hullum at the time of the kick signal nor at any time thereafter. He further testified that the kicking operations on this occasion were made without stopping; that there was no rule requiring the engine to stop before a kicking operation, and that it is safer on a downgrade track to move the cars in and spot them while attached to the engine rather than kick them.

The engine foreman, W. B. Bradley, testified that he was the foreman in charge of the switching crew, and that he was responsible for the safety of the equipment as well as the safety of the men. It was his duty to give the engine all signals in

connection with the switching operation; that he had given the engineer the signal to kick the cars on which Hullum was riding; that on this occasion it was necessary to kick the cars somewhat harder than usual because of the fact that in cold weather the cars will not roll as freely as in warm weather, but that the cars on the occasion in question did not exceed a speed of between four and six miles per hour. He testified that at the time the signal was given he did not have Hullum in his view because Hullum had crossed over the track ahead of the cars in order to align the switch and was, therefore, on the opposite side of the train from him; that he did not see Hullum when he reached the top of the car because of the fact that he was standing on the ground near the cars and could not, therefore, see on top of the cars. He further testified that although it was not the custom in the Tyler yards to bring the train to a complete stop before a kicking movement was made, it was done most of the time when such movement was made on a downgrade; that it was his duty to see that the men were in a safe position before a car was kicked, and that although there was nothing unusual about the kicking operation, it would have been safer to have shoved the cars to the desired location rather than to have kicked them.

The hospital records introduced by Appellants from the files of the St. Louis Southwestern Railway Lines Hospital where Mr. Hullum was treated contains a history of the injury related by Mr. Hullum upon his arrival there on December 22, 1961. The history related by him was as follows:

"Present Illness: The patient gives a history of injury on December 13, 1961, in the Tyler Yards. He was on top of a car (moving) trying to get from that car to the next. Then lost his balance. Fell between the 2 cars on the ground and apparently he was dragged for some distance before the cars came to a stop. Multiple injuries resulted."

The medical testimony shows conclusively that death resulted from the injuries sustained by him on the occasion in question.

In response to the Special Issues submitted by the court, the jury found (1) that the members of the defendant's switching crew did not fail to keep a proper lookout for decedent on the occasion in question; (2) that the defendant's switching crew immediately before the occurrence did not move the car they were switching at a speed in excess of that at which a person of ordinary prudence in the exercise of ordinary care would have moved the cars under the same or similar cicumstances; (3) that the kicking of the cars on the occasion in question was not negligence; (4) that the cars were not kicked harder than they would have been kicked by an ordinary prudent person in the exercise of ordinary care; (5) that the defendant did not fail to provide J. T. Hullum with a reasonably safe place in which to work; (6) that the death of J. T. Hullum was not due solely to natural causes; (7) that such injuries were a producing cause of his death; and (8) that the occurrence in question was the result of an unavoidable accident. The jury exonerated deceased, J. T. Hullum, of any contributory negligence and assessed the damages due his estate at $10,000.00 for his mental pain and suffering and loss of earning; assessed the damages of each of the minor children at the sum and amount of $20,000.00, and assessed the damages to Mrs. Adelle Hullum, his wife, at $42,500.00.

Appellants contend by their first two Points that the trial court committed reversible error in failing to submit to the jury their requested Special Issues No. 1A and 3A, followed by the subsidiary issues of negligence and proximate cause.

Omitting the subsidiary issue of proximate cause, the first requested issue read as follows:

1–A "Do you find from a preponderance of the evidence that kicking of the cars

on the occasion in question on a down grade was negligence?"

The court, no doubt, refused this issue because the court in his main charge had already submitted Special Issue No. 5 as follows:

"Do you find from a preponderance of the evidence that the kicking of the cars on the occasion in question was negligence?"

Thus, the only difference in the issue submitted and the one requested is that the phrase "on a down grade" was inserted. It was not disputed that the track at the point of the kicking operation was on a downgrade. All the witnesses testified that the track was on a slight downgrade and there is nothing in the record that would indicate the contrary. Quite obviously, Special Issue No. 5 was a much broader submission than that requested by the Appellants. It covered every aspect of negligence in the kicking operation and is a controlling issue, while the issue requested by Appellants would limit the inquiry as to whether or not it was negligence to kick the cars while on a downgrade and would, therefore, amount to nothing more than an evidentiary issue.

█ It is our opinion that the issue suggested by the Appellants is but another shade or phase of the same issues which had therefore been substantial and sufficiently covered by Special Issue No. 5 in the court's main charge.

"* * * It has never been the policy of the law to lengthen and complicate special issue charges by requiring trial courts to give issues that merely submit various phases or other shades of meaning of an issue already in the charge. It is required only that each controlling issue raised by the pleadings and the evidence be submitted once, fairly, simply and succinctly."

Northeast Texas Motor Lines, Inc. v. Hodges, 138 Tex. 280, 158 S.W.2d 487; Little Rock Furniture Mfg. Co. v. Dunn, 148 Tex. 197, 222 S.W.2d 985, Rule 279, Texas Rules of Civil Procedure. We fail to find any error in the court's refusal to submit Appellants' requested Issue 1A.

With reference to Appellants' requested Issue No. 3A, omitting the subsidiary issues of negligence and proximate cause, the requested Special Issue reads as follows:

3–A "Do you find from a preponderance of the evidence that the Defendant's crew on the occasion in question kicked the cars in question without first determining that J. T. Hullum was in a safe position aboard the car he was riding?"

Appellants contend that even though the court submitted other Special Issues covering (1) whether or not Appellee's crew kept a proper lookout; (2) whether Appellee furnished a safe place to work; and (3) whether or not the kicking of the cars on the occasion in question was negligence, the trial court erred in failing to submit this issue because this issue having been plead, presented another theory of recovery.

Appellants argue that since the engine foreman Bradley had a duty to know that his men were in a safe place before kicking the cars, and since he could not see Hullum from the position he occupied on the ground, even though he maintained a proper lookout from his position on the ground, Bradley failed to perform his duty in that he failed to determine that Hullum was in a safe position before commencing the kicking operation, which conduct presented an independent controlling issue on an additional theory of recovery.

█ What has heretofore been said with regard to the propriety of submitting Appellants' Specially Requested Special Issue No. 1A would appear to apply with equal force to this requested issue. It was Appellants' theory that the conduct of the switching crew in kicking the cars at the time, place and on the occasion under all

the surrounding circumstances amounted to negligence. It therefore appears to us that the submission of Special Issue No. 1 inquiring as to whether the other members of the Appellee's switching crew kept such a lookout for Hullum as would have been kept by an ordinary prudent person in the exercise of ordinary care under the same or similar circumstances, together with the submission of Special Issue No. 5 inquiring as to whether the train crew failed to use ordinary care in kicking the cars on the occasion in question would be sufficient to cover the controlling issue raised by the pleadings and evidence. It appears to us that these two issues would fairly and adequately cover every aspect of any negligence that could have possibly been involved in the kicking operation.

■ Where the controlling issues raised by the pleadings and evidence have been fairly, simply and succinctly submitted, a reversal cannot be predicated upon the trial court's failure to submit other and various phases or different shades of the same issue. Moreover, it is reversible error for the court to submit the same controlling fact question more than once, whether in identical language or merely in similar form. Western Gulf Petroleum Corporation v. Frazier Jelke & Co., Tex. Civ.App., 163 S.W.2d 860; Clary v. Morgan Motor Co., Tex.Civ.App., 246 S.W.2d 936; Texas & N. O. R. Co. v. Pool, Tex. Civ.App., 263 S.W.2d 582, Rule 279, T.R. C.P.

■ Appellants contend that the failure to submit these issues would amount to a denial of Appellants' "federally created rights" under the provision of the Federal Employers' Liability Act. This would, no doubt, be true if the Requested Issue presented an ultimate, controlling fact issue not already covered in the charge of the court, because the denial of such an issue would be to deny a substantive right. If, however, we are correct in holding that the trial court submitted all of the controlling fact issues made by the pleadings and the evidence, it appears to us that the Appellants were thereby afforded all substantive rights, in this respect, contemplated by the Act and the decisions of the federal courts. The question of whether the issues are to be further "pulverized" can be nothing more than a procedural question to be determined according to the procedural rules of the forum selected by the Appellants. Thompson v. Robbins, 157 Tex. 463, 304 S.W.2d 111; Dollie Adams Oil Corp. v. Cree, Tex.Civ.App., 279 S.W. 2d 619. Appellants' Points 1 and 2 are overruled.

By Appellants' third Point, it is contended that the trial court committed reversable error in failing to submit Appellants' Specially Requested Instruction No. 2 as follows:

"You are further instructed that the Defendant railroad is under a continuing non-delegable duty to provide its employees including the Plaintiffs' decedent, J. T. Hullum, with a reasonably safe place in which to work."

The charge of the court contained an issue inquiring as to whether or not Appellee furnished a safe place to work, together with a definition of the terms used therein.[1] Appellants registered no objection to the issue nor to the definition of the term "safe place to work", but requested in addition thereto the above instruction.

1. —SPECIAL ISSUE NO. 9
"Do you find from a preponderance of the evidence that on the occasion in question, December 13, 1961, the defendant failed to provide J. T. Hullum, deceased, with a reasonably safe place in which to work?
"You are instructed that by the term 'reasonably safe place in which to work', as used herein, is meant such a place with regard to safety of its employees as would be furnished by an ordinary prudent employer in the exercise of ordinary care under the same or similar circumstances."

Rule 277, T.R.C.P., provides in part as follows:

"In submitting special issues the court shall submit such explanatory instructions and such definitions of legal terms as shall be *necessary* to enable the jury to properly pass upon and render a verdict on such issues. * * *" (Emphasis added)

Instructions in the nature of a general charge are exceptional and as indicated by the Rule are to be given only when a necessity exists therefor. Boaz v. White's Auto Stores, 141 Tex. 366, 172 S.W.2d 481; Archey v. Nederlandsch-Amerikaansche Stoom, Maat., Tex.Civ. App., 354 S.W.2d 688, cert. den., 371 U.S. 929, 83 S.Ct. 299, 9 L.Ed.2d 236.

We fail to see how the knowledge on the part of the jury of the legal obligation of the railroad company's continuing non-delegable duty would, under the circumstances, have aided the jury in determining from the facts before it whether the railroad company had failed to furnish a safe place to work. We think the court's definition of the term "reasonably safe place to work" was a correct definition and was adequate under the circumstances presented here. Guthrie v. Sinclair Refining Company, Tex.Civ.App., 320 S.W.2d 396, n. r. e., cert. den., 361 U.S. 883, 80 S.Ct. 155, 4 L.Ed.2d 120.

If, however, the refusal by the court to submit the Requested Instruction be deemed to be error, we have concluded that such would not amount to such a denial of the right of the Appellee as to be reasonably calculated to cause, and probably did cause, the rendition of an improper judgment. Rule 434 and 503, T.R.C.P., Thompson v. Robbins, supra.

Point 5 complains of the action of the trial court in admitting testimony of W. B. Bradley, Appellee's engine foreman, concerning a conversation with the decedent while visiting with decedent in the hospital in Tyler. That portion of the conversation to which objection was made is as follows:

"Q. Did he (J. T. Hullum) tell you anything about what had happened?

"A. No, sir. Other than he said he didn't hold any member of the crew responsible or feel any ill feeling toward any member of the crew about the accident."

Appellants objected to the admission of this testimony on the grounds that it was a self serving declaration, hearsay and a conclusion. The objection was overruled.

As a general rule, declarations, statements, or admissions against interest are admissible in civil cases against the party making them. This rule is a well recognized exception to the hearsay rule. It has also been held that such statements by an ancestor against his interest which would be admissible against him if living are admissible against his heirs and legal representatives of his estate. McLean v. Hargrove, 139 Tex. 236, 162 S.W.2d 954; Hupp v. Hupp, Tex.Civ.App., 235 S.W.2d 753; Lubbering v. Ellison, Tex.Civ.App., 342 S.W.2d 796; 24 Tex.Jur.2d, Par. 613, p. 166.

We are likewise unable to agree with Appellants' contention that such testimony was objectionable as a conclusion. The opinion or conclusion rule is considered to be applicable only in regulating the examination of a witness on the witness stand, where under the supervision of the court, the witness can be required to give the specific facts and is not thought to apply to an out-of-court statement, declaration or admission. In light of the facts and circumstances presented here, we are inclined to believe decedent's statement that he did not hold any member of the crew responsible for the accident was admissible before the jury in the words of the declarant, even though it be considered a conclusion. Ferrand v. Houston & T. C. R. Co., Tex.Civ.App., 205 S.W. 845; Taylor v. Owen, Tex.Civ.App., 290 S.W.2d

771; McCormick & Ray, Texas Law of Evidence, Par. 1126, p. 23. Appellants' fifth Point is thought to be without merit.

The sixth Point complains of the action of the trial court in admitting into evidence, over Appellants' objection, a motion picture depicting the "kicking" movement of the train, contending that the film should not have been shown to the jury because the surrounding conditions, type of cars, the position of the crew and the speed of the movement as depicted by the picture was different from that on the occasion in question, thereby rendering such motion picture immaterial and highly prejudicial.

 In order to render evidence of an experiment made out of court admissible, it is generally held that there must be a substantial similarity between conditions existing at the time of the occurrence which gives rise to the litigation and those in existence at the time the experiment is conducted for demonstration purposes. It is not, however, essential that the conditions of the occurrence and the experiment be identical. When there exists a dissimilarity, testimony of an experiment should be excluded when the result thereof would probably confuse rather than aid the jury. There exists, however, an area wherein the determination of the admissibility of proffered experiment testimony rests within the discretion of the trial judge. This occurs whenever the dissimilarity between the occurrence, conditions and the circumstances of the experiment is minor or can be made abundantly clear by explanation. Fort Worth & Denver Railway Company v. Williams, Tex., 375 S.W.2d 279.

It is conceded that the film does not attempt to re-enact the fatal accident.

 Appellants contend that the demonstration depicted by the motion picture should not have been admitted in evidence because the movement was not shown to be similar to the actual occurrence in question in that the engine crew was not the same; the crew was not in the same position; the engine was not the same; the weather was much warmer; that no one was shown to be on top of the car in Hullum's position at the time the "kick" was made; that there were four gondola cars in front of the boxcar rather than boxcars, so that a man at the brake platform could be more easily seen; that the cars were moved more slowly; that the gondola cars used in the film were loaded, which would cause them to roll faster than empty cars, and that there was no bumping of the cars—they were merely cut off.

Appellee's engine foreman, W. B. Bradley, who was in charge of the switching operation on the occasion of Mr. Hullum's injury was also in charge of the switching operation at the time of the making of the film. He testified that except for himself, the engine crew used on the occasion of the film was not the same, nor was the same engine used; that the weather was much warmer; that no one rode on the boxcar in Hullum's position atop the boxcar. He further testified that in making the film, no attempt was made to do anything except to show the type of switching movement; that the film was shown to him after it had been developed and that the film was a correct portrayal, substantially, of the type of switching operation that was conducted on the date of the accident, and that it showed the same portion of the track where the accident occurred and that the speed of the movement was the same.

It is apparent from the record that the Appellee's purpose in offering the film was to demonstrate only the movement of the train while engaged in a "kicking" operation.

 The trial court ruled that the exhibition of the film to the jury would not confuse them, but would be of some aid to them and that the dissimilarities disclosed had either been explained or were capable of explanation so as to be readily understood. It occurs to us that the situ-

ation presented here falls within that area where the determination of the admissibility of the proffered experiment testimony rests within the sound discretion of the trial judge. Very few tests can be made under the exact conditions present when a prior event occurred. The law requires only that substantially the same conditions must exist. The trial court is allowed considerable latitude in determining whether the conditions are sufficiently similar to permit testimony about the tests. Fort Worth and Denver Railway Co. v. Williams, supra; Howell v. Missouri-Kansas-Texas Railroad Company, (Tex.Civ.App.), 1964, 380 S.W.2d 842; Morris v. Du Pont De Nemours & Co., 346 Mo. 126, 139 S.W. 2d 984, 129 A.L.R. 352; McCormick & Ray, Texas Law of Evidence, Vol. 2, page 322. No abuse of discretion is thought to be shown and the point is therefore overruled.

By Points 7 through 14 Appellants contend that the judgment should be reversed because the findings of the jury in response to each of the Special Issues is contrary to the evidence and is so against the overwhelming weight and preponderance of the evidence as to be manifestly wrong and unjust.

██ In approaching the problem presented by these assignments, we must keep in mind that we are here dealing with a cause of action created by our National Congress and jealously interpreted by the federal courts. The fact that the case was tried in a Texas court according to our local rules of procedure means little, if anything, when we come to decide the sufficiency of the evidence. Under the Federal Employers' Liability Act, the question of "what constitutes negligence, and the sufficiency of evidence to raise that question for the jury, is to be determined by the applicable federal decisions." Port Terminal Railroad Association v. Ross, 155 Tex. 447, 289 S.W.2d 220.

██ ██ Under the most recent federal decisions, the function of the jury in F.E.L.A. cases has been broadened to the extent that very little evidence is required to uphold a jury verdict of negligence. Rogers v. Missouri Pacific Railroad Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493; Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916; Deen v. Gulf, Colorado & Santa Fe Railway Co., 353 U.S. 925, 77 S.Ct. 715, 1 L.Ed.2d 721; Gallick v. Baltimore and Ohio Railroad Company, 372 U. S. 108, 83 S.Ct. 659, 9 L.Ed.2d 618; Basham v. Pennsylvania Railroad Company, 372 U.S. 699, 83 S.Ct. 965, 10 L.Ed.2d 80.

A review of the Federal decisions makes it clear that it is the federal policy to give the jury a much wider latitude than is customary under the state law standards established by our own Supreme Court. In the Rogers case, supra, it is there pointed out that it was the "basic congressional intention to leave to the fact-finding function of the jury the decision of the primary question raised in these cases—whether employer's fault played any part in the employees' mishap." And the Supreme Court then reaffirmed this position by saying it was "cognizant of the duties to effectuate the intention of Congress to secure the right to a jury determination (in FELA cases), (and) this court is vigilant to exercise its power of review in any case where it appears that the *litigants* have been improperly deprived of that determination." (Emphasis supplied). This decision is thought to be applicable to the right of the employer as well as to the right of the employee. Certiorari was denied in each of the following cases where the employee sought to overturn an adverse jury verdict. Jones v. Illinois Term. R. R., 347 U.S. 956, 74 S.Ct. 682, 98 L.Ed. 1101; Conser v. Atchison, T. & S. F. R. R., 348 U.S. 828, 75 S.Ct. 45, 99 L.Ed. 653; Metrakos v. Cleveland Union Term. Co., 348 U.S. 872, 75 S.Ct. 107, 99 L.Ed. 686; Kane v. Chicago, B. & Q. R. R., 348 U.S. 943, 75 S.Ct. 365, 99 L.Ed. 738; Daulton v. Southern Pac. Co., 352 U.S. 1005, 77 S.Ct. 564, 1 L.Ed.2d 549; Burch v. Reading & Co., 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d

914; Brinkley v. Penn R. R., 358 U.S. 865, 79 S.Ct. 94, 3 L.Ed.2d 97; and Masterson v. New York Cent. R. R., 361 U.S. 832, 80 S.Ct. 84, 4 L.Ed.2d 74.

In Tennant v. Peoria & P. U. R. R., 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520, the Supreme Court in a F. E. L. A. case said:

> "Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable."

That the applicable rules of state law on the question of the insufficiency of evidence do not apply to federally created rights has been foreclosed in this state by the decision of Deen v. Hickman, 358 U.S. 57, 79 S.Ct. 1, 3 L.Ed.2d 28.

In the Deen case the Supreme Court of the United States held, in effect, that in reviewing evidence of FELA cases the Texas standard of "against the [great] weight and preponderance of the evidence" is not applicable, and that reversal of a verdict of a jury on this ground is, as a matter of law, improper. The sequence of events giving rise to this opinion is significant. Initially the Texas courts disregarded a jury verdict in favor of an employee on the ground that there was "no evidence" of negligence. When this decision was reviewed by the United States Supreme Court at 353 U.S. 925, 77 S.Ct. 715, the case was reversed and remanded to the Texas Supreme Court. That court then returned the case to the Court of Civil Appeals for an independent determination of whether the answers of the jury were "against the great weight and overwhelming preponderance of the evidence." This action of the Texas Supreme Court was again appealed, and the United States Supreme Court again reversed, holding that an inquiry as to whether the verdict of the jury was against the great weight and preponderance of the evidence was "foreclosed."

The federal standards in evaluating jury verdicts in FELA cases have thus been compelled by the Supreme Court of the United States and the validity of those standards has been recognized by the Supreme Court of Texas. Robinson v. Gulf, Colorado & Santa Fe Ry. Co. (1959), Tex. Civ.App., 325 S.W.2d 432, err. ref., cert., 362 U.S. 919, 80 S.Ct. 672, 4 L.Ed.2d 739.

For the above reasons it appears that Points 7 through 14 are immaterial.

 We hasten to add, however, that we have had occasion to review all of the evidence in the case and have concluded that the findings of the jury are not so against the weight and preponderance of the evidence as to be manifestly wrong and unjust.

No reversible error being shown, it becomes the duty of this court to affirm the judgment of the trial court and it is so ordered.