Mrs. Carl B. **PITCOCK** et al., Appellants,

v.

**B & W INCORPORATED, Appellee.**

No. 15769.

Court of Civil Appeals of Texas,
Houston. (1st Dist.).

Dec. 30, 1971.

Rehearing Denied Feb. 10, 1972.

Frank W. Allen, Brown, Kronzer, Abraham, Watkins & Steely, Houston, for appellants; W. James Kronzer, Houston, of counsel.

Fulbright, Crooker & Jaworski, L. S. Carsey, Richard N. Carrell, Houston, for appellee.

PEDEN, Justice.

Wrongful death action arising from a mid-air collision between two aircraft, a converted Douglas B–26 and a Cessna 150, near Van Nuys Airport in California. The plaintiffs, appellants here, are the surviving beneficiaries of Carl B. Pitcock and Bruce James Schuyler. Pitcock was teaching Schuyler, the pilot, to fly the Cessna. The B–26, owned by the defendant company, was being flown by Dan Arney, and its co-pilot was Russell Rew. Trial to a jury resulted in a judgment in favor of the survivors of Schuyler for $10,000 and no recovery for Pitcock's survivors in view of a jury finding as to contributory negligence on his part.

Pitcock and Schuyler were killed in the accident. No radio transmission was received from them after take-off and prior to their deaths concerning the course or bearing of the Cessna. Arney and Rew were the only ones who testified that they saw the Cessna in flight before the collision. Both of them related that it was only a few feet ahead of them when they saw it and it was then in a right turn, apparently in an evasive maneuver. There was, however, circumstantial evidence concerning the course and bearing of the Cessna when the collision occurred.

The only jury findings of contributory negligence and proximate cause on the part of either plaintiff were those concerning the lookout kept by Pitcock.

The appellants' first point of error is that the trial court erred in admitting into evidence the appellee's posed photographic exhibits (DX 11–17), and the supporting proof relating to those photographs, purporting to reflect an extrajudicial experiment conducted by representatives of appellee to show whether the sun, on the flight path assumed by the appellee, would have been visible in the windshield of the Cessna or would have affected visibility from the Cessna, and to show whether, during the simulated experimental flight path of the two aircraft, the B–26 would have been visible to the approaching Cessna, for the reasons that the assumed conditions were totally dissimilar to what actually occurred, involved unproven assumptions of fact, were intended to only project appellee's theory, did not purport to depict what actually happened, were calculated to and did in fact mislead the jury, and were not subject to simple or any other readily understood explanation of the differences between the theory and the accident itself.

It was uncontroverted that visibility from each of the aircraft in question is limited in certain directions by structural braces, wings, cowling, etc.

We review the evidence as to the course flown by the aircraft on the occasion in question, summarizing first that which was offered by the plaintiffs (appellants).

V. B. Cole testified by deposition. He was on duty as an air traffic controller in charge of runway 16 right when the accident occurred. He has a transcription of the voice transmission of the pilots and the controllers on that occasion, prepared by the Federal Aviation Agency. The Cessna was identified as 88 Sierra and the B–26 as 94 Hotel. On July 3, 1968 at 4:32 P.M. plus 58 seconds, Pacific Daylight Saving time, ground control at Van Nuys Airport, said: "88 Sierra Skyways" (the Cessna) "taxi one six right time three two and a half." One six right was the right-hand runway of two which have a magnetic compass bearing of 160 degrees, or 20 degrees east of due south. At 4:36 plus 20 seconds, a voice from the Cessna said: "Van Nuys tower 88 Sierra blast fence ready for takeoff."

At 4:36 plus 25 sec., "88 Sierra hold short." From the Cessna came the acknowledgment "88 Sierra."

At 4:37 plus 45 sec. the control said: "Cessna 88 Sierra cleared for takeoff."

The acknowledgment: "88 Sierra."

Then at 4:40 plus 35 sec. a transmission was received from the B–26: "Van Nuys tower 94 Hotel five miles south downwind for one six right."

The control tower replied "94 Hotel right traffic one six right report downwind." The B–26 answered "94 Hotel, Roger."

At 4:41 plus 15 sec., Rew in the B–26 said "Van Nuys tower, 94 Hotel," then there was a pause. "We just, ah, struck a Cessna 150 just on the other side of the freeway."

The control tower said "94 Hotel, say again."

At 4:41 plus 40 sec., Rew responded: "94 Hotel, we are behind the tower crossing Sherman Way, we just struck a Cessna 150, a blue and white one, and, ah, it looks like he spun in."

The tower said "94 Hotel, Roger, cleared to land one six right."

The tower tried to contact the Cessna by radio, but to no avail. There were other voice transmissions.

The elevation at Van Nuys airport is 800 feet, mean sea level. Under Visual Flight Rules, the approach pattern for heavy aircraft such as the B–26, there is indicated an altitude of 2300 ft. m. s. l. and for light aircraft, such as the Cessna 150, 1800 ft. m. s. l.

Cole found nothing unusual in the position of the B–26 when its pilot called in and wanted to land at Van Nuys Airport. He does not remember watching either of the planes and did not realize the Cessna and B–26 were going to the same area, because he had no idea which way the Cessna 150 was going. He knows now, because of the accident, the Cessna did not turn west. Chances are, it was a southwesterly departure.

John Dickinson testified that Van Nuys Airport was one of the busiest in the world.

The appellants offered the deposition testimony of Adam Berg. Carl Pitcock had worked for him as a flight instructor for about two and a half years, and Bruce Schuyler had been a student in Berg's flight school. Schuyler had received his private pilot's license. Berg was flying at the time of the accident and learned about it when he landed. The Cessna 150 had a 100 horsepower engine, it normally cruised at about 95 m. p. h., its rate of climb was 500 feet per minute and it normally climbed at 72 m. p. h. for maximum efficiency.

Berg teaches his instructors who are using runway 16 right to have their students fly out straight when they leave the traffic pattern until they get over Van Owen St., and if they have reached as much as 500 feet above the ground, then to turn 90 degrees to the right. Upon reaching Balboa Blvd. they would then turn 45 degrees left, which would be generally a southwest direction (205 degrees), then go on out to a practice area in the valley, due west of the airport. His company records indicate Pitcock was on his way to give Schuyler a lesson that day.

The student sits in the left seat, or the pilot's seat, and the instructor sits in the right seat.

Visibility on the day in question was three miles. The Cessna 150 was new. Berg wasn't present when the Cessna left and has no idea what pattern they followed out of the airport except that he knows what the school taught the pattern to be.

Except for looking up above the wing, the Cessna 150 has the best visibility of any airplane.

Under normal conditions the pilot would have climbed to 4500 feet m. s. l. at about 500 feet per minute, but it was a hot day, so he may not have been able to climb at that rate. He would have flown on the 205 degree heading until he reached the Ventura Freeway, then he would have flown west. The accident occurred before he got to the Ventura Freeway.

On a day that is clear, but hazy, the sun provides an impediment in the Valley to visibility of a pilot flying in a westerly or southwesterly direction.

Southwest from the point where this accident happened are the Santa Monica Mountains. The elevation of their top is about 2500 feet m. s. l. In July they are brown, as were the sides and bottom of the B–26. The attitude of a Cessna 150 climbing at its normal climb-out rate is such that if it is about 2000 feet high on a 205 degree heading out of Van Nuys Airport, its pilot will not be looking into the Santa Monica Mountains ". . . if you look to the left and the airplane was to the left and the mountains were to the left the same color, there is a possibility you wouldn't see the airplane."

Plaintiff-appellant offered deposition testimony of Rew under the adverse party rule. He was in charge of the B–26 on the flight in question, but Arney was actually flying it. They were flying to Van Nuys Airport from Santa Monica Airport, a ten or twelve mile flight, almost due north, when the collision occurred. They took off from Santa Monica Airport on a runway in a westerly direction, gained altitude of 1200 or 1500 feet, then turned right until they were headed toward Van Nuys Airport. To go over the Santa Monica Mountains, he thinks they climbed to 3000 or 3,500 feet above sea level. He believes his heading was 340 degrees (20 degrees west of north) at the time of the collision, they were about two miles west of the center of runway 16 right of Van Nuys Airport and three and a half or four miles south of the control tower. He estimates the B–26 had been on the 340 degree course for a mile or a mile and a half before the collision. When they first assumed the 340 degree heading, some five miles or so south of the tower, he would say the altitude of the B–26 was between 2000 and 2500 feet. At impact, its altitude was about 2000 feet above sea level.

When he first saw the Cessna it was past their nose in a climbing right-hand turn, about a 50 degree bank or so. He saw more of its belly than anything else. It was just to the left of the nose of the B–26. A 50 degree turn is rather steep, so he thought it was taking evasive action. It was 50 feet away, at most, when he first saw it. He had been reaching back for a check list. The B–26 was then making about 160 knots, or about 190 miles per hour.

Visibility from a B–26 is not the best. To the side, it becomes more and more limited to a 90 degree point unless the other aircraft is above your altitude. If it is below, and at a 45 degree angle, visibility is obstructed.

The right main landing gear of the Cessna made a mark on top of the left wing of the B–26, the trailing edge of the Cessna's right wing destroyed the front of the replaceable left wing tip of the B–26 and the horizontal stabilizer of the Cessna struck the leading edge of the left wing of the B–26 inboard of the tire mark and outboard of the engine nacelle.

Rew testified that the conversations transcribed by the control tower were not the only ones transmitted at the time in question. He said the Cessna crashed at the corner of White Oak and Martha, some three or four miles southwest of the control tower, but that he didn't see it after impact. He now knows that large aircraft, such as the B–26 were supposed to approach Van Nuys Airport at 2300 feet m. s. l.

Visibility was five miles that day, and there was haze. The sun was not obscured by the haze.

EXHIBIT

[A4992]

This map may be helpful in understanding the testimony. True north is at the top of the map. The scale is: one inch equals approximately nine-tenths of a mile. The wreckage of the Cessna was found at the point marked with an X. Plaintiffs' position is that the collision occurred above the point marked with a P. Rew testified that the collision occurred approximately over the area marked with an O. We have drawn a line showing a 90 degree turn right and a 45 degree turn left leaving Van Nuys Airport.

Dan Arney's deposition testimony was offered by the plaintiffs. After take-off westerly from Santa Monica he made a climbing turn out over the ocean before taking up a heading of about 30 degrees for Van Nuys. He maintained that heading and continued to climb until he was about six or six and a half miles from the control tower at Van Nuys, at which time his altitude was around 3400 or 3500 feet. He then changed his heading to about 340 degrees and began his gradual descent on the downwind leg of his approach to Van Nuys Airport. At impact his altitude was 2000 feet m. s. l. He had hit the switch to lower his flaps, and may have been looking at the flaps when he looked back, saw the Cessna, and took his hand off the flap switch. He doesn't know how much his flaps had been lowered.

At impact he was flying relatively level at a little less than 160 knots. The Cessna was immediately in front of him when he first saw it. It was in a nose-high attitude to him and he saw the bottom of it, so he assumes it was in a right turn. It was Rew who talked to the control tower at Van Nuys.

Plaintiff Mrs. Pitcock, widow of the deceased instructor, testified that she had been taught to fly by her husband at Van Nuys Airport. It was the habit of people who flew out of that airport to turn west when they got over Van Owen St. if they had attained at least 500 feet in altitude. They would maintain that westerly heading until reaching Balboa Blvd., then would turn left and fly in a southwesterly direction. She said that when she reached the Ventura Freeway, usually at about its intersection with White Oak, she flew west with the Freeway and usually a little south of it.

The Cessna hit the ground at White Oak and Martha, about two blocks north of the Ventura Freeway.

Her husband taught her that if she was to fly out west to the practice area, she should take up a western route just south of the freeway.

The parties stipulated that Bruce Schuyler was five feet, eleven inches tall and weighed 160 pounds and that Carl Pitcock was five feet, nine inches tall and weighed 168 pounds.

The defendant called Rew to the stand as its first witness. He marked on an exhibit his best judgment was that the collision occurred in an area about one-half mile northeast of the place where the Cessna struck the ground. On cross-examination he stated that the collision happened about five minutes after the B–26 took off from Santa Monica. It was probably heading north when he first reported in to the Van Nuys tower at the five mile point. At that time they were five miles south and downwind, a little west of the tower. They turned left 20 degrees. When, after the collision, he told the tower they had struck a Cessna 150 just on the other side of the freeway, both the B–26 and the tower were north of the freeway, but he meant that the collision occurred north of the freeway, because he was speaking in reference to his position on his previous call, which was from five miles out and thus on the south or other side of the freeway.

The B–26 was at about 2000 feet when the aircraft collided. The pilot of the Cessna must have seen the B–26 and put his aircraft in a tight turn to the right. He thinks the Cessna was heading in a

southwesterly direction. The speed at which the B–26 was being flown was about three times that of the Cessna when the Cessna is in a normal climb.

The defendant next called Russell P. O'Quinn as a witness. He testified outside the hearing of the jury that he is president of a company that provides high-performance flight testing of aerospace products and systems. He has piloted aircraft for about 6750 hours in his 15 years of flying for a living. He was asked by defendant to undertake to simulate or duplicate as near as possible the flight path and altitude of a Cessna 150 aircraft which was involved in the collision in question so as to determine 1) whether the sun would have been visible in its windshield or cockpit or would have affected visibility forward out of the cockpit and 2) whether during that simulated flight path and climb, when the Cessna was at 2000 foot altitude, a B–26 approaching from the south would have been visible above the mountains located south of Van Nuys. In conducting this flight he was given the basic information as evaluated by the National Transportation Safety Board. The Weather Bureau records, admitted in evidence, show that at 4 P.M. on July 3, 1968 visibility from the Van Nuys tower was six miles and that there was haze. A special observation was made at 4:42, showing that visibility was 7 miles and that it was clear. On July 3, 1969 the report at 4 P.M. was 4 miles and haze and at 5 P.M. it was 3 miles and haze and smoke. On July 3, 1970 at 4 P.M. the report was 6 miles and at 5 P. M. it was again 6 miles.

He made a flight on July 3, 1969 and attempted to simulate all the conditions present during the flight in question on July 3, 1968. He used a Cessna 150 of the same model as flown by the decedents, had the same roll-time on the runway and took off at the same time of day as the decedents' aircraft. He picked July 3, 1969 so as to duplicate as closely as possible the sun angles on July 3, 1968, and found that the difference in the sun's elevation on the two days was less than half a minute, which is no practical difference. As to the azimuth angle of the sun, the difference between the two days amounted to only five minutes. John Galvin, a photographer accompanied him. Galvin is 5 feet, 10 inches tall and weighs 170 pounds. O'Quinn is 6 feet, 1 inch tall and weighs 190 pounds.

They took off on runway 16 right at Van Nuys Airport, climbed in a straight-out heading until reaching Van Owen St., when their altitude was 550 feet, having climbed at a speed of 70 to 75 miles per hour. They made a 90 degree turn to the right and flew on that heading until reaching 850 feet above ground level, when they made a 45 degree turn to the left; this turn was made approximately, but not precisely, over Balboa Blvd. They flew from there on this heading (205 degrees), still climbing at approximately 72 miles per hour (this gave a climb rate of about 500 feet per minute), the published standard climb speed for the Cessna 150, until they sighted the B–26.

He noted that on this 205 degree heading, while he was continuing to climb at the same rate, the sun was well above the upper loft line of the windshield and approximately 20 degrees to 25 degrees to his right, so "the sun was no prohibiting factor in observing anything within the windshield loft line." They could not see the sun from the normal position in the cockpit, and there was no detectable glare from the sun that, in his opinion, caused any obstruction to visibility through the windshield forward or to the left.

He held that 205 degree heading until he reached 2000 feet. Rew, flying the B–26, had previously taken off. He was to hold in the Hollywood Hills area on a time lapse basis until after he heard the release time of the Cessna, then to come in from the south on a 340 degree heading over the ground track as closely as possible to that he had flown the day of the accident. They attempted to duplicate the collision course up to a point.

As they were climbing on the 205 degree heading, he and Galvin sighted the B–26 at a distance of about 3 miles. At all times after they sighted it until they passed or broke off the test, the B–26 was silhouetted above the mountains and against the sky. They saw it before they reached 2000 feet and they continued to watch it as they climbed to that altitude. They were about a quarter of a mile north of the Ventura Freway when they reached 2000 feet.

Galvin was there to take motion pictures of the climb but, because of a technical problem with the camera, was unable to take any pictures.

On July 3, 1970 another flight was made by the same two men on exactly the same profile and at the same time of day; this time Galvin made pictures with a 35 m.m. camera held at eye level. The pictures taken that day show with a real degree of accuracy what they saw. O'Quinn then described what each slide portrayed. The second was taken at 1700 feet m. s. 1. from mid-windshield when the B–26 was about 4 miles away. In the third it was about 3 miles distant and the Cessna was at 1750 feet. In the fourth slide the Cessna was at 1800 feet m. s. 1. and the B–26 was about two and one-half miles away. In the fifth the Cessna was at 1850 feet and the B–26 was about one mile away. When the sixth picture was taken, O'Quinn had turned slightly left away from the 205 degree course to avoid the danger of a collision with the B–26. The other two slides, marked D–11 and D–12 showed the two aircraft used in the test before take-off.

On cross-examination, O'Quinn stated that on the three separate occasions there were different wind conditions. The fuel tanks were full on each take-off except the last one, when a negligible amount had been used. He admitted that he could not say that it would be possible when there are two airplanes traveling at different rates of speed and at different altitudes to ever again recreate the same altitude and attitudes that the two airplanes had on the

occasion in question. He had the wind direction and velocity at 4 P.M. on each of the three occasions from records in evidence as reported at the F.A.A. tower, but he did not know what they were at take-off time on July 3, 1969 or July 3, 1970. He said it was of negligible consequence. He didn't know the temperature all along the path of the Pitcock airplane, and temperature affects rate of climb.

His turn over Balboa was made perhaps a hundred feet east of Balboa. Rew began his run from approximately a mile southwest of Encino Reservoir. He wasn't asked to make any pictures looking back at a point directly south of the airport while he was south of the Ventura Freeway and was headed due west.

In response to questions on re-direct examination O'Quinn testified that the slides show approximately the same angle above the hills and the position of the B–26 in the sky with relation to the horizon as he observed on all the tests he conducted from the cockpit of the Cessna. Also that the slides adequately portray what he has testified to and observed with regard to its elevation above the horizon on sighting.

Defendant then stated that it offered the slides, DX 13–17, solely to illustrate those things the witness saw and to show what the elevation of the B–26 would have been and the visibility from the Cessna in a normal climb heading and altitude which was testified to, which simulates that of the Cessna. Further, "With this conditional offer, that the flight path and the altitude of the B–26 will be established from evidence, although he has testified to what it was in his opinion approximately, I can and will—I can assure the Court I will furnish evidence later if they object to it, that the B–26 was during these runs at 2000 feet and on the heading which we described. Then, I believe that the entire testimony concerning the flights is admissible and those pictures are admissible simply because they are visual representations of the testimony and will be helpful and

will be of assistance to the jury to demonstrate those things for which the limited— for which we offer them for the limited purpose of the test, that is to determine the sun angle, whether it would be visible on a 205 degree heading, which their witness Adam Burg said the plane should have been on and probably was. And that the aircraft was, during all portions of the climb, in a position where the B–26 would have been situated against the sky and not against the mountains, in direct refutation of the evidence of Mr. Burg."

The plaintiffs objected to the photographs on the basis that they were not made under such similar conditions as would justify the court receiving them in evidence under the applicable law; they did not object, during this questioning outside the presence and hearing of the jury, to the witness' testimony. The trial judge announced that he would admit the photographs.

The jury then returned to the court room, and much of O'Quinn's testimony was again given, detailing the particulars of the Cessna flights on July 3, 1969 and July 3, 1970. He testified to some additional data. He said the seats in the Cessna 150 are not adjustable up and down. They discontinued the 1969 test because of other air traffic coming into the pattern and because the camera they were using was too large and its lens was not at the proper eye level when in use. He was asked whether it made any difference in the results of his test if the B–26 was farther south than was indicated by the information he had received. He replied that as to illustrating visibility, the track would have provided all that was necessary for the purpose for which the test was performed. They were able to see the B–26 along its course adequately at each position. He first sighted it at about three miles distance. It was visible above the Hollywood Hills (apparently the same as the Santa Monica Mts.) at all times.

The photographic slides were offered in evidence in the presence of the jury. The appellants' objection was that no proper predicate had been laid, they were based upon hearsay and there is not close enough similarity between the simulation and the occurrence to justify their admission; that they are prejudicial. The objection to the slides was overruled; again, no objection was made to O'Quinn's testimony.

O'Quinn testified that they had approximated the attitude of the aircraft, or tried to, according to the information in details that were given to them. He said that if the Cessna had crossed Ventura before the collision and was heading west, the sun would be facing its pilots and might get to a shorter man quicker than it would to him.

The defendant recognized, in its conditional offer of the slides, that it had not shown the flight path of the B–26 on the test runs. We will notice the testimony of the witness Rew, who was again called by the defendant and testified about such flight path. He related that on the flight tests made with O'Quinn he had tried to duplicate as near as possible the exact track of the B–26 on the date of the accident. He flew at 2000 feet and took up a 340 degree heading after crossing over the Encino Reservoir.

However, on cross-examination Rew admitted the accuracy of his earlier testimony that the B–26 had turned left by 20 degrees after he had called in to the Van Nuys tower. The significance of this testimony is that it suggests that on the 1968 flight the B–26 approached Van Nuys from east of the Encino Reservoir instead of from above it. The appellants also cross-examined Rew with respect to the position of the B–26 when he first announced to the tower that it was "five miles south down wind for 16 right." Appellee asserted this meant he was already southwest of the airport because he was already reporting in on an extended down wind leg. A down wind leg to 16 right would have been parallel to that runway and west of it. Appellants say his report meant he was

five miles south of the tower, not southwest.

As to the Pitcock Cessna the appellants' position is that it was on a west (270 degree) heading when the collision was imminent, so the opportunity to see the B–26 was less that it had been when the Cessna's course was 205 degrees, or southwesterly.

Other evidence was later adduced as to the 1968 flight of the two aircraft and the test flights, but no motion was made to strike the exhibits in question, so we will not review it here.

It is appellants' position that the Cessna had crossed the Ventura Freeway and had turned in a westerly direction from a bearing of about 205 degrees to one of about 270 degrees when it was struck. The appellee offered no slides to illustrate the visibility from the Cessna in the latter bearing. Appellants say that such a turn would have adversely affected the visibility of the B–26 from the Cessna because of the greater influence of the sun and because the B–26 would then be in the position of overtaking the Cessna rather than approaching from the side and slightly ahead.

█ We find no merit in appellants' assertion in their first point of error that the trial court erred in admitting the proof supporting the photographic exhibits made by O'Quinn and Galvin since no objection was made to such testimony. As to the exhibits themselves, a difficult problem is presented.

The Texas Supreme Court has, in the case of Ft. Worth & Denver Rwy. Co. v. Williams, Tex., 375 S.W.2d 279 (1964), written on the admissibility of photographs of an experiment designed to demonstrate visibility of an object.

"In order to render evidence of an experiment made out of court and without the presence of the opposing party admissible, it is generally held that there must be a substantial similarity between conditions existing at the time of the occurrence which gives rise to the litigation and those in existence at the time the experiment is conducted for demonstration purposes. It is not, however, essential that the conditions of the occurrence and the experiment be identical. Houston, East & West Texas Ry. Co. v. Sherman, Tex.Com.App., holdings approved by the Supreme Court, 42 S.W.2d 241 (1931); Rodgers v. State, 93 Tex. Cr.R. 1, 245 S.W. 697 (1922). When there exists a dissimilarity, testimony of an experiment should be excluded when the result thereof would probably confuse rather than aid the jury. There exists an area wherein the determination of the admissibility of proffered experiment testimony rests within the discretion of the trial judge. This occurs whenever the dissimilarity between the occurrence conditions and the circumstances of the experiment is minor or can be made abundantly clear by explanation. Houston, East & West Texas Ry. Co. v. Sherman, supra. Panhandle and Santa Fe Ry. Co. v. Haywood, Tex.Civ. App., 227 S.W. 347, wr. ref. (1921). See, Annotation, Experimental evidence as affected by similarity or dissimilarity of conditions, 85 A.L.R. 479."

In that case the purpose of the experiment was to demonstrate the effect of a strong beam of light upon the eyes of a person approaching the beam from an angle of about 90 degrees, and the motion picture film represented the retina of the human eye upon the hypothesis that what is shown to be disclosed or obscured on the camera film would also be disclosed to or obscured from the human eye. Care and caution must be exercised in admitting this type of experiment evidence. Complicated scientific and perhaps physiological factors may be encountered. No showing was made as to the candlepower of the light used in the test and no pictures were made at a distance from the light approaching its distance when the accident occurred.

"Before it can be said that dissimilarity of conditions merely goes to the weight hence presents a jury question, the judge must be able to say with some degree of certainty that confusion will not occur and such dissimilarities as are disclosed are capable of explanation so as to be readily understood."

The court pointed out in the Williams case that the defect relating to the admission of the experiment evidence lay primarily with the inadequate basis relied upon to support its introduction.

What are the dissimilarities of conditions between the courses and bearings of the two aircraft on their flights of July 3, 1968 and July 3, 1970? We look first to the dissimilarities between the two flights of the two Cessna 150 aircraft.

According to the testimony, the pictures were taken at eye level by Galvin, who was 5 feet, 10 inches tall, and weighs 170 pounds; Pitcock, who sat in the same right-hand seat as did Galvin, was 5 feet, 9 inches tall and weighed 168 pounds. The seat could not be raised or lowered, and the record is silent as to whether it could otherwise be adjusted. O'Quinn weighed 190 pounds, and Schuyler weighed 160 pounds.

The Pitcock Cessna 150 was new; the one used for the tests was of the same year and type, so two years later it was presumably about two years old. Presumably the Pitcock Cessna had full fuel tanks; the O'Quinn Cessna had full tanks less what it took for one test run of the course. O'Quinn testified this was a negligible factor.

Visibility on July 3, 1968 at 4:42 P.M. was 7 miles and there was no report of haze; on July 3, 1970 at both 4 P.M. and 5 P.M. visibility was 6 miles with haze, so visibility is indicated to have been a little better at the time of the collision than during the test.

Wind direction at the control tower at 4:42 P.M. on July 3, 1968 was 110 degrees at 12 knots; on July 3, 1970 it was 150 degrees at 10 knots at 4 P.M. and at 5 P.M. it was 100 degrees at 10 knots. We do not know exactly what the wind conditions aloft were on either occasion. O'Quinn testified that the wind would have a negligible effect on the test.

We do not consider that these demonstrated dissimilarities in conditions were sufficient to give rise to confusion or that they were incapable of explanation so as to be readily understood. A more vexing question is whether the evidence as to the course and bearing of the Pitcock Cessna up to the moment of collision was so indefinite and required so many assumptions that the appellee could not sustain his burden of demonstrating that the test conditions were essentially the same as those which led to the collision.

It is certain that it would be virtually impossible to duplicate the flight of the Cessna on July 3, 1968 on the basis of the information in the record. However, few tests are made under the exact conditions present during the prior event. O'Quinn, the defendant's witness who conducted the experiment, admitted that he could not say it would be possible to ever again recreate the same altitude and attitudes that the two airplanes had on the day of the collision.

Yet it was the plaintiffs who offered most of the evidence as to the flight of the Pitcock Cessna in discharging their burden of proof. We consider that such evidence was sufficiently definitive to provide the basis for test flights.

According to O'Quinn's testimony, on the course he flew the sun was not a "prohibiting factor" and caused no detectable glare that was an obstruction to visibility through the windshield in the direction from which the B–26 was approaching.

There were inconsistencies and some conflicts in the testimony touching on a proper lookout. Appellants contend that the test photographs are admissible only if they show a duplication of the occurrence

as established by the testimony of all the witnesses and not just a theory of a party, citing 2 Scott, Photographic Evidence (2d Ed.) 463, § 1101:

"Reenactments of accidents. The question frequently arises as to the admissibility of posed photographs of the scene of a highway collision showing vehicles in the position of the cars involved in the accident. Such pictures usually are considered admissible when it is proved that they reconstruct the collision substantially in accordance with the testimony of all the witnesses. There is a conflict of authority, however, as to the admissibility of photographs in the nature of reenactments when there is a dispute as to whether they show the correct positions of the colliding vehicles. Posed photographs of the scene of a highway collision representing the theory of one party as opposed to the other have been held admissible in some cases, and inadmissible in others.

"To be unobjectionable a photograph in the nature of a reenactment of a highway collision should comply with the rule regarding experiments. A picture that was not taken under substantially the same conditions as those existing at the time of the accident should not be admitted."

Clearly, the tests were not conducted substantially in accordance with all the testimony of all the witnesses, but we have examined the authorities cited[1] in the Williams case, supra, that are relied on by appellants as to this theory, and do not believe they commit Texas to the proposition that the photographs in this case are rendered inadmissible by reason of what variance there was between the testimony of the witnesses.

█ It has been held in a number of cases in other jurisdictions that photographs portraying a hypothetical situation or a theory of one of the parties, as distinguished from the actual situation, are inadmissible. We hold that under the evidence in this case the trial court did not abuse his discretion in admitting the photographs because the defendants made a sufficient showing that their test flights were substantially accurate.

█ The majority of cases appear to support the rule that posed photographs based on recollection as to the position of persons or movable objects are admissible as illustrative of the testimony of witnesses where a proper foundation therefor has been laid by preliminary testimony showing that the objects and situations portrayed are faithfully represented. 19 A.L.R.2d 880. The fact that part of the data as to positions of the aircraft was based on circumstantial evidence rather than recollection does not, we feel, change this rule.

Appellants' second point of error is that the trial court erred in admitting into evidence appellee's exhibits numbers 19 through 22 and the supporting testimony of witness Bobby R. Allen, for the reason that said exhibits, being intended and calculated to show what persons in the position of occupants of the Cessna (and particularly Pitcock) could have seen with respect to the alleged approach of the B-26 were highly prejudicial and were not supported by the basic photographs used to compose the montages.

The witness Allen was called by the defendant. He testified that he was from 1959 until mid-1970 with the Civil Aeronautics Board and the National Transportation Safety Board, having served as director of the Bureau of Aviation Safety from 1964 to 1966. His employment had involved the investigation of the causes of fatal accidents to civil aircraft.

Allen testified about his assumptions (based on testimony) as to the flights of

---

1. Wigmore on Evidence (3rd Ed.) §§ 798–799, Vol. 3, pp. 201–208. See also Scott, Photographic Evidence, §§ 624 and 625, Annotations, 27 A.L.R. 913, 19 A.L.R.2d 877, 83 A.L.R. 1315, 129 A.L.R. 361, 78 A.L.R.2d 152.

the Cessna and the B–26 on the day of the collision. He described the marks made by the Cessna on the left wing of the B–26 in the collision, and calculated the angle of relative bearing for each aircraft as to the other.

He explained that to show the field of vision of a person (it being some 45 degrees wider than that of the camera he and his assistant used), they had to take four pictures from the position of each of the two pilots in the Cessna. Each picture was taken from a different angle, and each shows a tape measure placed across in front of the cockpit. The pictures taken from the left seat were placed together by referring to the tape measure to get each one in its proper overlapping position, and the same procedure was followed with those taken from the right seat. A photograph was then made of each of these composites, and these photographs were offered in evidence; the first, as DX 19, was said to depict the viewing angle from the left seat and the second, as DX 20, that from the right seat. Allen testified that the basic photographs and the montages made from them each accurately portrayed the subject matter in question. The original basic photographs were not produced, however, and they were not shown to be unavailable. The appellants objected that no proper predicate had been laid, that at least the "actual photographs, apparently pasted together" should be introduced as a predicate. The objection was overruled. We hold that the trial court erred in doing so.

■ In Texas it is clear that under the best evidence rule, photographic copies of documents are not ordinarily admissible as originals without accounting for the document itself. 2 McCormick & Ray, Texas Law of Evidence (2d Ed.) 407–08, § 1564. We perceive no reason why this rule should not apply to the original basic photographs and hold that the party introducing the pictures made of them should be required to produce the originals as sup-

porting proof so that the opposing party could examine the way the pictures were put together and thus test the expert's opinion. Exhibits DX 19 and 20 were used as the basis for demonstrating the respective fields of vision of the Cessna pilots, and they were also the basis for preparation of charts DX 21 and 22, from which Allen testified as to the position through the windshield where the B–26 should have been visible to Pitcock. Since DX 21 and 22 were based on DX 19 and 20, they should also have been excluded.

We have examined all the evidence adduced in the trial and the testimony of the jurors on the motion for new trial based on jury misconduct. We cannot say that the admission of exhibits DX 19–22 constituted reversible error as to Pitcock's beneficiaries. The exhibits may have helped Schuyler's beneficiaries by indicating that visibility of the B–26 from his position was impaired. There was other evidence in the record on which the jury may have based its finding that Pitcock failed to keep a proper lookout. O'Quinn's testimony and the photographic slides DX 14–17, which were taken from the same right-hand seat occupied by Pitcock, indicate that the B–26 was visible from that position during the test flight. Rule 434, Texas Rules of Civil Procedure; Perez v. San Antonio Transit Co., 342 S.W.2d 802 (Tex.Civ.App.1961, writ ref.)

■ We overrule the appellants' third point of error, which is that the trial court erred in refusing to grant a new trial to the statutory beneficiaries of Bruce James Schuyler because the finding of the jury in response to Special Issue No. 27 is grossly inadequate.

We have considered the whole record and conclude that the trial court did not abuse its discretion in denying the motion for new trial based on inadequacy of the damage finding.

Affirmed.