**PORT TERMINAL RAILROAD ASSOCIA-TION, Appellant,**

v.

**Philip MACALUSO, Appellee.**

No. 15552.

Court of Civil Appeals of Texas, Houston (1st Dist.).

Feb. 5, 1970.

Rehearing Denied Feb. 26, 1970.

Wm. H. Tenison, Jr., Richard W. Burns, Houston, for appellant, Andrews, Kurth, Campbell & Jones, Houston, of counsel.

Garrett & Letbetter, Tom R. Letbetter, Houston, for appellee.

BELL, Chief Justice.

This is a case arising under the Federal Employers' Liability Act. Appellee was a switchman for appellant and had been for about 19 years when he was injured while throwing a switch on November 28, 1966. He was at that time foreman of a switching crew. He injured his low back on the right side. On trial appellant was found guilty of several acts of negligence in connection with the maintenance of the switch at which appellee was injured. Appellee was acquitted of any contributory negligence. The jury found past medical expense for which appellant had not paid to be $106.00 and future medical of $3,600.00. The evidence would support the $3,600.00, but appellee had pleaded for a lesser amount so there was a remittitur of the amount in excess of that prayed for. The jury found that $90,000.00 would compensate appellee for wages lost to time of trial, mental pain and suffering to the date of trial, mental pain and suffering in the future and loss of earning capacity.

The sole point asserted on appeal is that $90,000.00 is extremely excessive and the trial court erred in not requiring a remittitur. Appellant asks a remittitur of $50,-000.00.

Mr. Macaluso testified that on the evening shift on November 28, 1966, he attempted to throw the switch at the National Molasses plant and it put a strain on his low back. He felt a very sharp pain in his

back. He mentioned this to the switchman working with him. He was foreman but he referred to himself as a working foreman who often threw switches himself and did not leave such work to his helpers alone. The work of a switchman frequently requires jumping from a moving train, moving fast ahead to throw the switch, throwing the switch and remounting the moving train. The evening of the injury he was suffering pain in his low back on the right side. On completing his work he went home and took a hot bath. As he continued to suffer pain his wife and daughter gave him an "alcoholic rubdown." He then lay on his back in bed. He slept very little that night. He went to work the next evening. On going home after work the therapy above mentioned was repeated. Again he slept very little. His low back on the right side continued to pain him and he is able to get only five or six hours sleep a day.

When he did not improve he went to Dr. Williamson, his family doctor, who gave him some pills to relieve his pain. His pain having continued he went to Dr. Braadstad who sent him to the Methodist Hospital to determine whether he had appendicitis. Examination revealed he did not.

He had had back injuries in 1955, 1957 and 1958, but apparently recovered because he was free of pain from 1958 to the date of his injury in 1966. He did his work, played soft ball regularly, bowled and swam frequently without pain or trouble. He cannot engage in the enumerated sports now. During these 8 years he missed very few days from work and none because of his back.

Since his injury in 1966 he has seen, in addition to the two doctors mentioned above, Drs. Lane, Brownhill, McGehee, Robertson and Peterson.

Since his return to work, he finds it painful to work. His fellow workers help him in his work. The Company frowns on others doing your work. If they do too much of it you may get fired. Jumping off moving trains causes his whole lower back to "shake spasm like." Due to the pain in his back since November 28, 1966 to the date of trial which began March 24, 1969, he missed 106 days of work, 35 of these being in 1968 and 9 during the first three months of 1969. In addition he has on many occasions received calls to work at times other than his regular shift but has been unable to respond because his back was giving him trouble. He still gets only five or six hours of sleep. He cannot lie in certain positions. His pain in his right low back and right leg continues. It hurts him to cough, sneeze and strain at stool. It hurts to sit in crouched positions. He must earn a livelihood for his family and he worries over his condition. Working aggravates his condition. He has numbness in his right leg at times. At time of trial he was taking traction three times a week at Dr. McGehee's. Prior to going to Dr. McGehee he was wearing a "corset" prescribed by Dr. Lane. Dr. McGehee prescribed a back brace that he wears all of the time. He went to Dr. McGehee about two weeks before trial. He had seen him once.

Mr. Hanson, one of the men working with appellee the night of the injury, testified he saw appellee throw the switch where he was injured. After that appellee wasn't getting around as swiftly and was not at ease. Instead of bending over to throw other switches appellee had to go into a squatting position. The men on the crew helped out more the rest of the night. They have helped him since then. He used to do his work exceptionally well, but now can't bend like others do and cannot get around freely. The witness, since the accident, has thrown switches for appellee. He has observed other crew members doing the same. The night of the accident appellee said he hurt his back or side. Mr. Hanson wrote "side" in his report.

Mr. Bass, a locomotive engineer with appellant, worked with appellee prior to November, 1966, and never noticed any back problem or heard of any. He has not worked with him since.

Mr. Hamilton, an engineer with appellant, had not worked with appellee the last ball with him in 1963, '64 and '65. Appellee was older than most of them, but was very agile. He was never aware of appellee having any back problem during these years.

C. W. Smith, a fellow worker, worked with appellee off and on for nine years before 1966. Before the '66 injury he was a good worker. He is not the same as before.

Phyllis Macaluso, the daughter, corroborated her father concerning his curtailed activities, his exhibition of pain and physical therapy she administered.

Mr. Hulen, the yardmaster, testified appellee reported his injury to his back in November. He was not familiar with any other back trouble. Appellee since the injury has lost "right smart time." When he is there he does his work.

Dr. F. O. McGehee saw appellee March 12, 1969. The history given the doctor was in all material respects the same as shown on appellee's testimony, which we have related above. He gave appellee a physical examination. Dr. McGehee is an orthopedic specialist of many years' experience. He found pain extending into the right leg to the knee. The Patrick test showed positive on the right.

The Patrick test tests the integrity of the ligaments and stability of the sacro-iliac joints. Appellee evidenced pain on the right side. No pain on the left. This meant he had injury, probably most severe, limited to one side. There was muscle tightness and there were muscle spasms. There was 50% restriction in motion. X-rays were taken. They showed a large curve of the sacro-iliac joints on each side. There was softening of L 3, 4 and 5 intervertebral discs. There was very mild spurring which is early beginning of hypertrophic arthritis. In his opinion the conditions described were directly related to the '66 injury but some of it might be related to the previous injuries. The degenerated type disc protrudes at times and presses against the nerve root. It will bulge out and then "drop back in the slot." This causes recurrent pain. Trauma to an existing condition increases that condition. (Appellee had also pleaded aggravation of previously existing conditions if any existed.) It is probable, however, that previous injuries had no real effect. The whole trouble might emanate from the '66 injury. In Dr. McGehee's opinion he could not go out and obtain and retain employment and in this sense he was totally and permanently disabled. An operation would relieve the pain but wouldn't help him get employment. He cannot do strenuous work. His 1967 injury could have some effect on the disc. One leg being one inch shorter than the other could cause spasms.

Dr. Robertson examined appellee in April, 1967. He related the same history to Dr. Robertson. Dr. Robertson is a neurosurgeon of many years' experience. He made a neurological examination. There was pain at the crest of the ilium posterially about 25 inches from the midline. On standing he noted no curvature of the spine. On lateral flexion in either direction there was pain. There was tenderness, on pressure, to the right of L 4 and L 5 and sacral 1 and 2 spinous process. Straight leg raising to 80° on either side produced pain on the right side of low back. The pain begins at an elevation of 45° and increases from that point to 80°. Sciatic nerve stretch was negative. There was no motor weakness and no sensory changes of lower extremities. There was slightly detectable diminution of the tendon Achilles reflex on right side. This reflects some impairment of the nerve supply to the particular muscle. He could not make a

definite diagnosis, but said one must suspect some involvement of the nerve root of the first sacrum. He felt there was early phase of degenerative disc with impingement on the nerve root. The injury, it seems in reason, would be the cause of the disc condition. Appellee's condition would tend to disable a person from doing hard manual labor. His injury in 1955, when he missed 43 days, would make no important difference. His injuries of 1957, 1958 and 1967 could confuse the picture.

Dr. Lane saw appellee in December, 1966 and took the history of injury of November from him. Appellee complained of low back pain. He had consulted other doctors but had not improved. Examination reflected marked rigidity of lumbar area and marked restriction of motion on attempted flexion and extension. Tenderness in low back. Neurological examination was within normal limits and x-ray revealed no bony or joint pathology. He was never sure of diagnosis. He had been treating the patient off and on for 14 years. Patient had had previous episodes at same location. Returned to light duty December 15. He saw patient again January 4, 1967. Patient still complained a good deal of pain. The doctor gave injections of zylocaine and hydrocortisone. He advised continuation of therapy and to return to see him in two weeks. Two weeks later examination for nerve root pressure was negative. Again advised continuation of therapy. In March, 1967, patient still complaining of pain. There were negative findings except for tenderness. He was hurt in another accident in February, 1968. Electromyograph was negative. Diagnosis still indefinite but the doctor has seen him enough to think he does hurt. He last saw patient in January, 1969. X-ray of lumbar spine showed spurring of osteoarthritis in upper lumbar spine. There is narrowing between vertebrae in region of osteoarthritis. There is no great amount of arthritis in lumbar area. If the patient played soft ball from 1959–66 and had not seen a

doctor for his back, he wouldn't say he had a chronic back.

Dr. Williamson saw patient in December, 1966. His trouble was between L 5 and S–1 intervertebral discs. While he had previously treated patient beginning in 1965, such was for minor things. This was the first complaint of back and hip problem. He did not see him after that time.

Dr. Braastad diagnosed as strained back and there was probably no permanent disability.

At the time of his injury, appellee was 53 years of age and at the time of trial was 56 with a life expectancy of 18.4 years.

The evidence showed specifically that appellee lost work following his injury as follows: 15 days in 1966, 47 days in 1967, 35 days in 1968 and 9 days from January 1, 1969, until the commencement of trial on March 24, 1969, or a total of 106 days. Appellee had testified generally that he had had to turn down calls for work that he received at times apart from his regular shift.

The record shows that appellee's annual earnings were as follows: for 1962 $6,522.-57, 1963 $6,445.00, 1964 $7,138.79, 1965 $6,817.50, 1966 $7,806.17, 1967 $7,298.07 and 1968 $8,040.69.

■ The wage rate at the time of lost work, we gather from appellee's brief, which is not challenged by appellant, averaged $31.25 per day. His lost wages to date of trial based on this figure would amount to $3,312.50. This would amount to about $1,100.00 per year. If projected through the period of life expectancy of 68 years the future loss would be about $19,800.00 or a total of $23,112.50 if the wage rate remained the same. However, we are now and for some time have been in an inflationary period which promises

to continue some time into the future. This usually results in increased wage rates which increases loss to a person who has to miss work. In addition to the specific days missed, there are the unenumerated ones where extra work was available but had to be turned down. A jury could consider this factor in determining his reduction in earning capacity. The testimony would warrant the jury in concluding his capacity to work has, by reason of the injury, been substantially impaired. There is no mathematical formula by which his future earning capacity will result in any particular amount of dollar loss. A court and jury, based on the record, must just make a reasonable estimate. The same is true with regard to a determination of compensation for mental pain and suffering.

While the record shows greater earnings for 1967 and 1968 than for the previous few years, this increase was due largely to increase in rate of pay.

■ In most cases it is most difficult to determine whether a verdict is excessive. We certainly may not merely substitute our judgment for that of the jury. If on considering the whole record there is reasonable basis for the jury award, we should not disturb it. We can only exercise what we conceive to be a sound judicial judgment in ascertaining what would be reasonable compensation for the injury and treat the balance as excess. Wilson v. Freeman, 108 Tex. 121, 185 S.W. 993; Flanigan v. Carswell, 159 Tex. 598, 324 S.W.2d 835 (Tex.S.Ct.).

■ We are of the view, based on the whole record, the material parts of which we have recited, that we cannot say the amount awarded by the jury is unreasonable. It is not, therefore, excessive.

Affirmed.