GENERAL MOTORS CORPORATION, Appellant,

v.

Curtis Lee SIMMONS et al., Appellees.

No. 16705.

Court of Civil Appeals of Texas, Houston (1st Dist.).

Nov. 24, 1976.

Rehearing Denied Jan. 13, 1977.

504

Harry M. Reasoner, Eleanor Swift Glass, Alan Schulman, Francis E. McGovern, II, Houston, Vinson, Elkins, Searls, Connally & Smith, Houston, of counsel, Gus M. Hodges, Austin, of counsel, Frazer F. Hilder, Thomas W. Watkins, Diane L. Kaye, Detroit, Mich., of counsel, for appellant.

Joseph D. Jamail, S. Gus Kolius, Houston, for appellee Curtis Lee Simmons.

Finis E. Cowan, Houston, Baker & Botts, Houston, of counsel, for appellees Hestle Andrew Johnston and Feld Truck Leasing Corp.

COLEMAN, Chief Justice.

This is a suit for damages for injuries received in an automobile collision. The plaintiffs sued the driver of the other vehicle and its owner alleging negligence and proximate cause, and General Motors Corporation alleging negligence per se and products liability. Questions involving indemnity and contribution are presented. The case was tried to a jury and based on the verdict a judgment for the sum of $1,000,000.00 was awarded to the plaintiff and against the defendant General Motors Corporation. The judgment denied General Motors relief on its cross-action for indemnity or contribution. General Motors has properly perfected its appeal. The judgment is reformed and as reformed is affirmed.

The plaintiff Curtis Lee Simmons was involved in an intersectional collision while

driving a 1962 model Chevrolet Impala. Simmons' car was struck at the left front door by a truck owned by the defendant Feld Truck Leasing Corporation and operated by the defendant Hestle Andrew Johnston, an employee of Feld. Simmons suffered personal injuries, principally lacerations of his eyes.

Suit was brought by Simmons against both Johnston and Feld alleging several acts of negligence which proximately caused the collision and resulting injuries to Simmons. Subsequently, defendants Feld and Johnston filed a third party action seeking contribution and indemnity against General Motors alleging that the direct and immediate proximate cause of Simmons' injuries was General Motors' use of defective window glass in the left side window of the 1962 Chevrolet Impala. Simmons amended his petition to charge General Motors with negligence and strict liability in the use of the left side window glass. Subsequent amendments by Simmons and the third party plaintiffs Feld and Johnston added allegations of negligence per se premised on Article 6701d, § 136(a), V.A.C.S., other acts of negligence and breach of warranty.

General Motors denied Simmons' and the third party plaintiffs' allegations and asserted that the sole proximate cause of plaintiff Simmons' accident and injuries was the conduct of Johnston and that any damage suffered by Johnston and Feld was proximately caused by Johnston's negligence.

During the pendency of the suit Simmons entered into a covenant not to sue and an indemnity agreement with defendants Feld and Johnston. For a monetary consideration Simmons covenanted not to sue or seek recovery against Feld and Johnston and also agreed that in the event he was successful in prosecuting his action against General Motors and was paid a money judgment by General Motors, Feld Truck Leasing Corporation would receive from Simmons from the proceeds of such judgment 50% of each dollar recovered up to a total amount of $200,000.00.

After entering into this agreement Feld and Johnston filed amended pleadings in which they acknowledged the fact that they had entered into the covenant not to sue and into an indemnity agreement and further acknowledged that the accident "had occurred because Hestle Andrew Johnston, Jr. had disregarded either a red light or a yellow caution signal and that they therefore had a liability to Curtis Lee Simmons for some damages." The defendants Feld and Johnston further alleged that while they were responsible for the collision in question, the sole proximate cause (as that phrase is defined in law) of the plaintiff's loss of eyesight was the negligence of General Motors Corporation and the failure of General Motors Corporation to produce a non-defective vehicle. General Motors then filed a cross-action against Feld and Johnston seeking indemnity or contribution. The trial court refused to permit General Motors to reveal the existence of the indemnity agreement to the jury.

The jury found that General Motors had placed glass in the left door window of Simmons' automobile which was "not manufactured, fabricated or treated so as to substantially prevent the glass shattering and flying when broken," [Substantially in the language of Article 6701d, Sec. 136(c)], and that such failure was a proximate cause and the sole proximate cause of the injury to Simmons' eyes. The jury also found that General Motors had equipped the automobile with glass in the left side window which was defective, and that such defect was a producing cause and the sole producing cause of the injury to Simmons' eyes.

The trial court instructed the jury that the statute of the State of Texas applicable to safety plate glass in motor vehicles at the time the Curtis Simmons vehicle was manufactured and registered in the State of Texas reads as follows:

"Section 136(a). It shall be unlawful after the 1st day of January, 1948, for any person to sell any new motor vehicle nor shall the same be registered in this state, unless the doors, windows and windshields of such vehicle be equipped

with safety glass wherever glass is used in doors, windows and windshields.

"(c) The term 'safety glass', as used in this Act shall mean any product composed of glass so manufactured, fabricated or treated as to substantially prevent shattering and flying of the glass when struck or broken."

General Motors objected to such instruction on the ground that it was totally inapplicable to the case and did not aid the jury in rendering a verdict and was so prejudicial as to deny General Motors a fair trial. The objections were overruled. It appears that this statute had been amended and that the amended statute had gone into effect two days prior to the date of the collision. The statute as amended does not use the word "safety glass." The amended statute reads:

"On and after January 1, 1972, no person shall sell any new motor vehicle as specified herein, nor shall any new motor vehicle as specified herein be registered thereafter unless such vehicle is equipped with safety glazing material of a type approved by the Department of Public Safety wherever glazing material is used in doors, windows and windshields  .    .

"(b) The term 'safety glazing materials' means glazing material so constructed, treated or combined with other materials as to reduce substantially, in comparison with ordinary sheet glass or plate glass, the likelihood of injury to persons by objects from exterior sources or by the safety glazing materials when they may be cracked or broken."

While the language of Section 136(a) of Article 6701d, both as enacted in 1948 and after its amendment in 1971, is not specific on this point, no question has been raised but that the offense created by the Act was the sale or registration of a new motor vehicle in Texas, which fails to conform to the statute in effect at the time of such sale or registration with respect to the type of glass which was used in the doors, windows and windshields of the vehicle. There is no evidence that the vehicle in question in this case was sold by General Motors to a customer within the State of Texas. There is no evidence that General Motors violated the Act in the absence of evidence that the vehicle in question when "new" was registered by General Motors in the State of Texas or was sold by General Motors to a customer within the State of Texas.

It might be argued, however, that the statute enacted in 1948 constituted a standard of care required of all manufacturers of automobiles brought into the State of Texas. The argument would be that the purpose of the statute was to set a standard of care for the manufacturers of automobiles used on the highways of the State of Texas.

■    Neither statute expressly requires automobiles to be equipped with safety glass or safety glazing materials. Both effectively prohibit the sale of new cars to residents of Texas unless they meet certain safety standards. A statute should not be construed so as to ascribe to the legislature an intention to do an unjust or unreasonable thing if the statute is reasonably susceptible of a construction that will not accomplish this result. The court construing the statute should ascertain and give effect to the legislative intent. *Anderson v. Penix*, 138 Tex. 596, 161 S.W.2d 455 (1942).

It is clear that the legislature did not intend to require that all motor vehicles using the highways of this State be equipped with safety glass. It does not appear that it was the purpose of the legislature to require that manufacturers of automobiles or other motor vehicles equip those to be sold in states other than Texas with safety glass. Such an action at least with respect to manufacturers located outside the limits of the State of Texas would be ineffective. Neither can the language of the statute reasonably be construed to prohibit transportation into the State of Texas of privately owned motor vehicles not equipped with safety glass. State laws or regulations that run afoul of the policy of free trade reflected in the Commerce Clause of the Constitution of the United States are invalid. *Bibb v. Navajo Freight*

*Lines, Inc.,* 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959).

In *Rudes v. Gottschalk,* 159 Tex. 552, 324 S.W.2d 201 (1959), the court said:

"Fundamentally, however, the application of proscriptions contained in criminal statutes as standards for determining tort liability stems from the judicial action of civil courts . . . Actions expressly provided for by statute are to be distinguished from actions based upon the doctrine of negligence per se. In the latter type of action, the civil courts may and often do consider acts or omissions as negligent because of criminal regulations against them, although such acts or omissions would not be considered negligent under the ordinarily prudent man test . . . We adopt the statutory test rather than that of the ordinarily prudent man as the more accurate one to determine negligence because the Legislature, by reason of its organization and investigating processes, is generally in a better position to establish such tests than are the judicial tribunals. But this does not mean that the criminal statute is always accepted as a test of negligence by the civil courts under all circumstances . .

"As the power of adopting or rejecting standards rests with the civil courts, we may accept or reject the criminal statute or use such part thereof as may be deemed appropriate for our purposes. *Phoenix Refining Co. v. Powell,* Tex.Civ. App., 251 S.W.2d 892, wr. ref. n.r.e.; Clarence Morris, 'The Role of Criminal Statutes in Negligence Actions,' 49 Columbia Law Review 21; Morris, 'Studies in the Law of Torts' p. 141. We have applied standards set forth in criminal statutes even to those persons who are expressly excepted from criminal responsibility thereunder. See Article 30, Vernon's Tex. Penal Code, and compare *Sorrentino v. McNeill,* Tex.Civ.App., 122 S.W.2d 723, wr. ref."

▮ There is evidence that the glass in the left front door of the plaintiff's 1962 model automobile met the standard for "safety glazing material" set out in the amended statute. It is obvious that the 1962 model automobile was not sold or registered "new" after the amended statute was enacted. The question arises as to whether there is any statutory standard of care which was applicable to the manufacturer of the plaintiff's automobile on the date of the trial of this case. By amending Section 136 the legislature repealed the provisions requiring the use of safety glass as well as the provision of the statute defining the term "safety glass." *Gordon v. Lake,* 163 Tex. 392, 356 S.W.2d 138 (1962).

The question then arises as to whether the court should accept as a standard of conduct the provisions of a statute which was in force at the time the alleged negligence occurred or whether because of the subsequent repeal of the statute the court should refuse to apply the legislative standard and should place on the jury the burden of determining a standard of reasonable conduct to be applied in the particular case. The standard set by the amended statute should not be applied. Whether conduct which occurred in 1962 was that of a reasonably prudent man in the exercise of ordinary care should be judged by the conditions and standards that existed in 1962. *Ward v. Hobart Manufacturing Company,* 450 F.2d 1176 (5th Cir. 1971).

In *Clinkscales v. Carver,* 22 Cal.2d 72, 136 P.2d 777 (1943), Justice Traynor, in writing the opinion of the court, stated:

" . . . The propriety of taking from the jury the determination of negligence does not turn on defendant's criminal liability. A statute that provides for a criminal proceeding only does not create a civil liability; if there is no provision for a remedy by civil action to persons injured by a breach of the statute it is because the Legislature did not contemplate one. A suit for damages is based on the theory that the conduct inflicting the injuries is a common-law tort, in this case the failure to exercise the care of a reasonable man at a boulevard stop. The significance of the statute in a civil suit for negligence lies in its formu-

lation of a standard of conduct that the court adopts in the determination of such liability . . . The decision as to what the civil standard should be still rests with the court, and the standard formulated by a legislative body in a police regulation or criminal statute becomes the standard to determine civil liability only because the court accepts it. In the absence of such a standard the case goes to the jury, which must determine whether the defendant has acted as a reasonably prudent man would act in similar circumstances. The jury then has the burden of deciding not only what the facts are but what the unformulated standard is of reasonable conduct. When a legislative body has generalized a standard from the experience of the community and prohibits conduct that is likely to cause harm, the court accepts the formulated standards and applies them . . . , except where they would serve to impose liability without fault . . .

" . . . When the court accepts the standard it rules in effect that defendant's conduct falls below that of a reasonable man as the court conceives it. It does no more than it does in any ruling that certain acts or omissions amount as a matter of law to negligence . . . An appellate court is concerned with determining whether the trial court arrived at a proper standard in a particular case . . . "

■ A standard set by the legislature should not be adopted by the courts when the legislature subsequently determines that it is not a proper standard. Neither would the standard subsequently developed by the legislature be applicable. As a general rule the legislature may change existing laws, both statutory and common, unless in doing so it deprives a person of a property right theretofore acquired under existing law. To be a "property right" the right must be more than a mere expectation based on an anticipation of the continuance of an existing law; it must have become a title, legal or equitable, to the present or future enforcement of a demand, or a legal exemption from the demand of another. If, before a right becomes vested in a person, the law upon which it is based is repealed, that particular person no longer has a remedy to enforce his claim, and if final relief has not been granted to him on the enforcement of a demand before such repeal, then no relief can be granted on his demand after the effective date of the repeal. *Aetna Ins. Co. v. Richardelle,* 528 S.W.2d 280 (Tex.Civ.App.—Corpus Christi 1975, writ ref. n.r.e.); *City of Dallas v. Trammell,* 129 Tex. 150, 101 S.W.2d 1009 (1937).

■ The common law test should have been applied by the court in determining whether or not the activity on the part of General Motors alleged and proven by the plaintiff constituted negligence. *Rudes v. Gottschalk,* 159 Tex. 552, 324 S.W.2d 201 (1959).

Under the evidence an issue of fact was raised as to whether the glass in the left front door window of plaintiff's car did in fact "shatter and fly" when it was broken. There was also an issue of fact as to whether tempered glass was manufactured in such a manner as to substantially prevent "shattering and flying" when broken. It is clear that the glass was designed to, and did, shatter when broken, but the evidence is conflicting as to whether it flew about in the car. There was evidence that glass which would shatter on breaking and would fly about in a car would be unreasonably dangerous to the occupants of the car. There was evidence that shattered bits of tempered glass were less likely to cause injury than bits of other types of glass.

The jury found in answer to Special Issue No. II that the glass in question was not manufactured, fabricated, or treated so as to substantially prevent the glass from shattering and flying when broken. By its answer to Special Issue No. III the jury found that "such failure" was a proximate cause of the injuries to plaintiff's eyes. These issues are in appropriate form to determine liability under the common law. No issue on whether "such failure" was negligence was submitted. There was no

objection to the charge of the court by reason of the failure to submit a negligence issue.

The ground of recovery consists of four issues. Three issues necessary to sustain the ground of recovery and necessarily referable thereto were submitted and answered by the jury. Rule 279, T.R.C.P., requires that the omitted issue be deemed found so as to support the judgment entered. *Wichita Falls & Oklahoma Ry. Co. v. Pepper,* 134 Tex. 360, 135 S.W.2d 79 (1940); *Smith v. Henger,* 148 Tex. 456, 226 S.W.2d 425 (1950).

■ The trial court over objection of General Motors admitted into evidence the terms of Article 6701d, Sec. 136(a) and (c). The court instructed the jury that the evidence was admitted for the limited purpose of illuminating and clarifying testimony concerning the nature and definition of the term safety glass. This instruction was unduly restrictive. The terms of this superseded statute were relevant to a material issue, and should have been admitted for all purposes. The fact that all 1962 model cars sold by General Motors in Texas were equipped with glass which did not meet a standard required by a law of this state would be admissible evidence on the issue of common law negligence despite the fact that there was no evidence that General Motors sold or registered the car in Texas. The purpose of the statute was to require the use of safety glass as standard equipment in new cars operating in Texas from and after the date the statute was enacted. It would be presumed that the legislature had determined that glass which would shatter and fly upon breaking was not sufficiently safe for use in automobiles. Permitting use of the statute as evidence of a proper standard of care would be calculated to assist the jury. The court did not err in permitting the statute to be read to the jury.

■ The appellant contends that the court's error in instructing the jury with reference to Sec. 136 of Article 6701d, Rev. Civ.Stat., and the submission of issues on the theory of negligence per se was clearly so pervasive and prejudicial as to affect the jury's determination of the issues submitted on defect under a products liability theory. There was no complaint that the court commented on the weight of the evidence by his instruction. Since the statute was in evidence the instruction was not harmful error.

■ This court is not authorized to reverse the judgment of the trial court merely because the record discloses some error that is reasonably calculated to cause a miscarriage of justice. It is the burden of the party appealing from a judgment to show also that the error probably did cause the rendition of an improper judgment in the case. *Dennis v. Hulse,* 362 S.W.2d 308 (Tex.1962).

The definition of safety glass contained in the Texas statute in 1962 was brought to the attention of the jury panel in the voir dire examination of the jurors. The prospective jurors were questioned relative to this statute. As an example, Mr. Jamail asked the panel the following question: "Would you be able by your verdict in following the evidence if by a preponderance of the evidence we are able to show in this case that the glass did shatter and fly, that it was a State statute, a law that said 'This is not safety glass, safety glass must not shatter,' would you be able to say so?"

In his voir dire examination the attorney for General Motors told the jurors that at the time Mr. Simmons' vehicle was assembled General Motors used laminated safety glass in the windshields and tempered safety glass in the side windows. He stated that the reason that the two kinds of safety glass were used was because they had different functions and responded differently in different situations. He stated "The adoption of these two kinds of glass was done after a great deal of study was given to the whole subject matter of glass to be used in motor vehicles and this is something that is not just a whim on the part of the automobile manufacturers or automobile designers; this is something that is controlled by law in this country. Before Gen-

eral Motors adopted either type of glass, either the laminated glass or the tempered safety glass, it was necessary that a specific kind of glass be submitted to the authorities in the various states including the State of Texas and that permission be obtained to put that glass in the automobile. And the State of Texas . . . this was done in this case . . . A sample of the laminated safety glass for the windshield and tempered safety glass for the pertinent parts of the vehicle, the side windows and back light, the back window they called it, were submitted to the proper authorities of the State of Texas and were specifically approved for use in motor vehicles in this State. And General Motors Corporation didn't adopt that type of glass until that approval by the State of Texas was in their hands . . ."

At the time the attorney for the plaintiff offered Article 6701d, Sec. 136, as it existed in 1962, into evidence there was an objection. In response plaintiff's attorney stated that he was offering the statute for general purposes and also for the limited purpose of showing that the adverse witness Mattimoe testified that he was aware of the statute at the time the glass was made. He also stated that this was in response to the contention of General Motors that since they had submitted samples of glass to the proper officials of the State of Texas and had received a certificate of compliance that the glass did need to comply with the laws of the State of Texas. The attorney for Feld and Johnston joined in the offer of the statute for the limited purpose of illustrating "what was meant in the law and in the industry by the term safety glass." He argued that it was admissible in rebuttal of the testimony that Libby-Owens-Ford obtained a certificate from the State of Texas stating that the glass was safety glass.

The trial court admitted Sections 136(a) and (c) "for the limited purpose stated" and instructed the jury that the exhibit was offered and admitted "for the limited purpose of illuminating and clarifying . . . if it does in your judgment illuminate and

clarify . . . the testimony of the expert witnesses in this case concerning the nature of and definition of the term safety glass and that you may consider it only for this limited purpose."

The witness Mattimoe, called by General Motors, testified that tempered glass was "one of the only two types of safety glass that we are permitted to use according to the laws of most of the states including the State of Texas." The attorney for the plaintiff then stated to the witness: "I don't know if you are being critical of me or not for using the term 'shattering, shattering and flying,' but the reason why I use that terminology is because that terminology of the applicable Texas laws which regulate safety glass used in automobiles and it says it shall be 'product composed of glass so manufactured, fabricated or treated as to substantially prevent shattering and flying of glass when struck or broken,' and you are aware of that definition are you not?" The attorney for General Motors then objected, stating, "Your Honor, we object to that question because there is no such law at this time." The objection was overruled. The witness answered, "I have heard of that definition. I understand that it has been repealed or . . . what I'm trying to say is that we have approval of our glass products for use in the State of Texas . . ." He was then asked whether he thought the definition contained in the Texas statute was a bad definition of safety glass and he answered that it was a bad definition "because tempered glass is safety glass and tempered glass breaks into small pieces. Of course, tempered glass has been approved by the State of Texas."

A marked difference of opinion as to the suitability of tempered glass for use in the side windows of automobiles was expressed by the expert witnesses called by the plaintiff and by Feld and Johnston from the opinions of the expert witnesses called by General Motors.

Dr. Green, a well-qualified expert witness called by Feld and Johnston, testified that if safety is a consideration tempered glass

of the type used in the automobiles by General Motors in 1962 was not proper for use in automobiles' side windows. It was his opinion that such glass was unreasonably dangerous from the standpoint of the occupants' safety. He testified that accepting as a definition of the term "defective" the words "more dangerous than would be contemplated by the ordinary user or consumer" the glass used in the side windows of Simmons' automobile was defective.

Dr. Green made some tests in the courtroom which he said gave with substantial accuracy a method of evaluating what happened in Curtis Simmons' car at the time the accident occurred. He then conducted experiments before the jury during which both tempered and laminated glass was broken by bending. He stated that there was no mechanical or chemical procedure for tempered glass which would create adhesion of the particles when the glass was broken, and that a condition of lack of adhesion in the automobile window glass is intolerable.

General Motors called certain expert witnesses who testified that tempered glass was safer for use in side windows in automobiles than was laminated glass. They asserted that when tempered glass is broken it breaks into a large number of small pieces which are relatively less sharp than fragments of annealed glass, which is a component of laminated glass. They testified that the particles of shattered tempered glass do not fly of their own accord even though the breakage is caused by bending. They testified, however, that these particles will fly just as any other object will fly if energy is imparted to the particles by an outside agency.

General Motors introduced into evidence the Z–26.1–1950 Code for the use of glazing materials in automobiles. A witness testified that the Code was drawn up by a so-called Sectional Committee. This committee was made up of representatives of the National Bureau of Standards, the American Optical Society, the American Medical Society, the Insurance Companies Association, the American Society for Test-

ing Materials, the American Chemical Society, the American Society for Materials and Testing, the Society of Automobile Engineers, and other technical societies and public bodies, as well as automobile manufacturing companies and glass manufacturing companies. There was testimony that the Z–26 Code was recognized as the standard of the industry. There was testimony that the glass used in automobiles by General Motors in 1962 met the requirements of the Z–26 Code. There was testimony that Libby-Owens-Ford supplied the "proper authorities" of the State of Texas a description of the glass and a copy of an independent testing laboratory report showing that it met the requirements of the Z–26 Code. Certificates issued by the State of Texas Department of Public Safety and the Texas Highway Department certifying that the kind of glass which was used in the 1962 model Chevrolets could be offered for sale and used in motor vehicles on the highways of the State of Texas were introduced into evidence. There was testimony that the Z–26 Code specifically authorized the use of tempered safety glass in automobile side windows.

The certificates of the Texas Highway Department and the Department of Public Safety of the State, as well as the Z–26.1 Code were properly admitted into evidence on the issue of the negligence, if any, of General Motors. The 1962 statute requiring the use of safety glass and defining the term "safety glass" was also properly admitted into evidence on this issue.

Under the circumstances if the action of the trial court in charging the jury on the law applicable to safety plate glass in motor vehicles at the time the Curtis Simmons vehicle was manufactured and registered in the State of Texas constituted error, we cannot say that it probably resulted in rendition of an improper judgment. The trial court gave a definition of "defective" in connection with Special Issue No. 5. In argument counsel for plaintiff called the jury's attention to the definition and argued that the evidence required a finding that the glass was unreasonably dangerous.

There was sufficient evidence to support the jury's finding that the glass installed in the plaintiff's automobile by General Motors was defective. We cannot say that the jury disregarded the court's instruction and based its finding on the definition of safety glass found in the Texas statute rather than upon the evidence that the use of tempered glass in a side window of a car is unreasonably dangerous.

Even if the injection of the statute into the case and the submission of issues on negligence were to be held error, no new trial would be required because the jury also found issues which would support a judgment for the plaintiff on the theory of products liability.

General Motors alleges the trial court erred in submitting to the jury issues based on the product liability pleadings and also erred in the manner in which this theory was submitted to the jury.

Special Issue No. 5 reads:

"Do you find from a preponderance of the evidence that at the time General Motors assembled the vehicle in question, it was equipped with glass in the left side window which was defective?

"By the term 'defective', as used in this issue, is meant glass that is unreasonably dangerous.

" 'Unreasonably dangerous' means more dangerous than would be contemplated by the ordinary user or consumer."

The point of error urged upon this court is that the charge failed to instruct the jury that the determination that a product is defective must include a determination that the risk of danger outweighs the utility of the product. The objection to the charge presented to the trial court was the failure of the court to instruct the jury that there should be a balancing of the gravity and likelihood of harm against the burden of precautions to avoid the harm. Nowhere was the trial court's attention called to a contention that a determination must be made whether the utility of the product outweighed the risk of danger.

The objections made to the court's charge do not specifically and clearly point out that the definition submitted by the trial court failed to meet the "reasonable" expectations of the ordinary consumer as to its safety. *Texas Employer's Ins. Ass'n v. Jones*, 393 S.W.2d 305 (Tex.1965).

In *Yellow Cab & Baggage Co. v. Green*, 154 Tex. 330, 277 S.W.2d 92 (1955), the Supreme Court held that where the trial court gives a definition or an instruction in connection with a special issue, and a party is not satisfied with the instruction or definition given, all that is necessary to be done by the complaining party is to file an objection to the court's instruction or definition specifically and clearly pointing out wherein it is claimed the given instruction or definition is insufficient or is in error. Here the objection is that the court failed to advise the jury that the plaintiff's automobile or the glass utilized therein is not to be considered defective "unless some feature of the form of the material or operation of the same threatens harm to persons using the automobile to the extent  . ." The quoted portion of this objection is somewhat confusing. General Motors' real objection is that the court instructed the jury that "unreasonably dangerous" means more dangerous than would be contemplated by the ordinary user or consumer and failed to contain the element of "reasonable expectations of the ordinary consumer ás to its safety." The contention that the expectations of the ordinary consumer must be reasonable was not clearly presented to the court.

The objection made by General Motors is based on the case of *Henderson v. Ford Motor Co.*, 519 S.W.2d 87 (Tex.1974), a case involving the question of a design defect in an automobile. In testing plaintiff's evidence of an unreasonably dangerous design, the Texas Supreme Court suggested two alternative ways in which a plaintiff could discharge its burden of proof.

"Did some feature of the form of material or operation of the housing threaten harm to persons using the automobile to the extent that any automobile so de-

signed would not be placed in the channels of commerce by a prudent manufacturer aware of the risk involved in its use or to the extent that the automobile would not meet the reasonable expectations of the ordinary consumer as to its safety?"

The fact that a particular definition of a term has been approved by the Supreme Court does not necessarily mean that a differently worded definition is improper or erroneous. The test is the reasonable clearness of the definition to enable the jurors to understand the word or phrase and the wording to be used is largely in the discretion of the trial court. *Gulf Ins. Co. v. Vela*, 361 S.W.2d 904 (Tex.Civ.App.—Austin 1962, writ ref. n. r. e.). The definitions given by the trial court of the terms "defective" and "unreasonably dangerous" are taken from the language used in Section 402a of the Restatement (2d) of Torts, comment i. *Helicoid Gage Division of Amer. Chain & Cable Co. v. Howell*, 511 S.W.2d 573 (Tex.Civ.App.—Houston [14th] 1974, writ ref. n. r. e.).

The language of the issue, and the definitions accompanying it have been in general use by the courts of this state. We find no Texas case where the objections raised by General Motors have been discussed. However, the courts of other states have discussed the matters raised. In *Pyatt v. Engel Equipment, Inc.*, 17 Ill.App.3d 1070, 309 N.E.2d 225 (3rd Dist. 1974), the court held that the term "unreasonably dangerous" had no special technical or legal meaning and did not need to be defined in the court's charge. The court was of the opinion that "it is a term of both sufficient generality and particularity to be easily and commonly understood." The court suggested that the definition found in comment i of Section 402A of the Restatement of Torts "is evocative of the connotation that the reference to 'ordinary use' and 'ordinary knowledge' continues vestiges of the reasonable man or negligence standard" and that such references are undesirable in products liability cases.

In *Phillips v. Kimwood Machine Co.*, 269 Or. 485, 525 P.2d 1033 (1974), the court stated that the weighing of the utility of an article against the risk of its use is a question to be determined by the court in deciding whether the case should be submitted to a jury. When the court determines that the case should be submitted then the court would instruct as to what constitutes a "dangerously defective product."

See also *Berkebile v. Brantly Helicopter Corporation*, 462 Pa. 83, 337 A.2d 893 (1975).

The definitions in the court's charge are not incorrect, the errors asserted were not properly preserved, and the action of the court in giving the instructions was not error which probably resulted in harm to General Motors. See *Pyatt v. Engel Equipment, Inc.*, 17 Ill.App.3d 1070, 309 N.E.2d 225 (3rd Dist. 1974).

The objection to the charge on the ground that it failed to instruct the jury that the determination that a product is defective must include a determination that the risk of danger outweighs the utility of the product is actually a request to give an additional instruction which General Motors considered to be beneficial to it. In such a case it is incumbent upon General Motors to tender a substantially correct definition or instruction. No such requested instruction was tendered. *Querner v. De Spain*, 339 S.W.2d 723 (Tex.Civ.App.—San Antonio 1960, writ ref. n. r. e.). These objections to the court's charge do not present reversible error.

General Motors has complained that there is no evidence or, in the alternative, insufficient evidence to support the answers made by the jury to Special Issues Nos. 5 and 6. Special Issue No. 6 was predicated on an affirmative answer to Special Issue No. 5 which inquired whether at the time General Motors assembled the vehicle in question it was equipped with glass in the left side window which was defective. Special Issue No. 6 asked whether "such defect was a producing cause of the injury." There is some evidence from which the jury might have concluded that the tempered glass with which the car was

equipped at the time of the accident was not properly manufactured. Simmons argues in his brief that the glass removed from his eyes was slivered glass that shattered and flew through the automobile and into his eyes; that it was tempered side window glass, but that it was not properly tempered. Our attention is specifically called to the testimony of Mr. Mattimoe that it is characteristic of properly tempered window glass that upon breaking, it remains in its frame. Upon fracturing, properly tempered window glass does not explode. Properly tempered glass, upon breaking, breaks into fragments the edges of which are 90° and rarely in what is called an acute angle. When such glass is bent to the point of cracking, if properly tempered, the glass would drop straight to the floor rather than fly and shatter. From this evidence a conclusion could be drawn that the particular glass in the window at the time of the collision was defective. In the absence of evidence that this particular glass was installed by General Motors, the evidence that the glass was *improperly manufactured* would not support the answer made by the jury to Special Issue No. 5. *Ford Motor Company v. Matthews,* 291 So.2d 169 (Miss.1974). The evidence relating to improper design can support the issue since the inquiry refers to conditions existing at the time the car was built by General Motors. If the design was improper then the question arises whether the defective design was a producing cause of the injury. Evidence that the glass in the left front door at the time of the accident conformed to the design supports an affirmative answer to the producing cause issue.

There is testimony from which the jurors as reasonable persons could have concluded that General Motors made a decision in designing its 1962 model cars to use tempered glass rather than laminated glass in the door windows of all cars it assembled. Tempered glass was in the window of the lefthand door at the time of the accident. The jury could have concluded that as the result of a slight collision the tempered glass shattered and flew about in the car

with sufficient force as to penetrate Mr. Simmons' eyes; that the shattering was caused by the bending of the glass; and that the injury would not have been suffered had laminated glass been used. The jury could have concluded that this characteristic of the tempered glass would be unknown to the ordinary user and therefore more dangerous than would be contemplated by the ordinary user.

The testimony of expert witnesses that tempered glass was safer for use in automobile side windows than laminated glass, and somewhat less expensive was countered by the testimony of other experts that laminated glass was safer and that the use of tempered glass in car windows was unreasonably dangerous. The jury probably considered the advantages and disadvantages of the two types of glass and determined that laminated glass was safer and, in effect, that the risk of harm from the use of tempered glass was not overcome by the utility of the product. There is sufficient evidence to support such a conclusion and the jury's answer to Special Issue No. 5.

There was sufficient evidence from which the jurors reasonably could have concluded that the tempered glass in the left front window was defectively manufactured in that it was not properly tempered. The jury might have concluded that when the glass was broken, sharp pieces of glass were propelled into the car whereas had the glass been properly tempered the glass fragments would have been less sharp and fewer particles would have been propelled throughout the front seat area of the plaintiff's car. This evidence supports the findings made by the jury that the glass was defective and that the defect was a producing cause of the injury to plaintiff's eyes. *Bradford v. Bendix-Westinghouse Auto. Air Brake Co.,* 33 Colo.App. 99, 517 P.2d 406 (Div. 1, 1973). See also Anno. 54 A.L.R.3rd 352.

There is evidence to support a finding implied in support of the trial court's judgment that the glass in the left front door of the plaintiff's car was defective when it was sold by General Motors. There was

testimony that the glass does not deteriorate and that General Motors expects it to last the life of the car. Seventy-five percent or more of the glass installed in 1962 model General Motors cars was manufactured by Libby-Owens-Ford and bore the symbol "LOF". The glass in plaintiff's car bore this symbol.

The plaintiff testified that he was knowledgeable about cars and did his own work on his cars. He carefully examined the car before he bought it, and found it to be in good condition. The windows were not scratched or cracked and the left front window appeared to be the same as all the others. Mr. Simmons testified that he could tell "when windows have been installed as a repair sort of thing." From his examination of the windows he concluded that it had not been replaced and was the window "that came with that car when the car was made." There was no difference between that door window and the other door windows in the car. There was other testimony that the body of the car was in good condition when purchased and required no repair work other than a few rust spots.

▇ The fact that a product is defective at the time it is sold by the manufacturer may be shown by circumstantial evidence. *Darryl v. Ford Motor Co.,* 440 S.W.2d 630, 632 (Tex.1969); *Pittsburg Coca-Cola Bottling Works v. Ponder,* 443 S.W.2d 546, 548 (Tex.1969); *Bombardi v. Pochel's Appliance & T.V. Company,* 9 Wash.App. 797, 515 P.2d 540 (Div. 2, 1973, Mod. 10 Wash.App. 243, 518 P.2d 202).

▇ General Motors contends that the trial court erred in refusing to admit into evidence the covenant not to sue and indemnity agreement entered into between Simmons on one side and Johnston and Feld on the other. The agreement, set out in the pleadings, contained a paragraph reading:

"In the event the parties to this agreement are successful in their prosecution of their causes of action against General Motors and a judgment is rendered against General Motors for money damages, and thereafter paid, Feld Truck Leasing Corporation will be entitled to and will receive from the proceeds of such judgment 50% of each dollar recovered, up to $200,000.00. In no event shall Feld Truck Leasing Corporation be entitled to recover under this agreement more than $200,000.00. All sums not attributable to Feld Truck Leasing Corporation under this agreement shall be payable to and the property of Plaintiff, Curtis Lee Simmons, and his attorneys."

Feld and Johnston were not dismissed from plaintiff's case but remained first party defendants throughout the trial. The trial court gave no instructions to the jury that Feld and Johnston had settled with Simmons or that all disputes and issues of liability were settled between them. Nor was any instruction given that settlement funds could be repaid to Feld. However, during the voir dire examinations counsel for Simmons, as well as counsel for Johnston and Feld, told the prospective jurors that there was "no adversity" between Simmons, Johnston, and Feld. In their third party action against General Motors Feld and Johnston plead that they had settled with Simmons. This pleading was filed approximately two years prior to the date of trial. Counsel for the plaintiff Simmons stated to the jury at the beginning of his voir dire examination:

"This is a lawsuit against General Motors primarily, and only, as far as plaintiff is concerned. This is a suit seeking money damages and a great deal of money damages against General Motors Corporation for the injuries and damages which they have inflicted through their product on Mr. Curtis Lee Simmons."

The panel was informed that the plaintiff Simmons was seeking damages against General Motors for the injuries because General Motors was solely responsible for the injuries, even though Feld and Johnston may have been responsible for the collision. The jury panel was specifically told that Mr. Simmons was not asking any money damage from Mr. Cowan's client who was operating the truck. Mr. Cowan also told the jury panel that there was no "adversity

or diversity of interest" between plaintiff Simmons and his clients. During his examination of the jury panel counsel for General Motors stated:

"There is no adversity of interest between plaintiff, Mr. Simmons, and his lawyers and Feld Truck Leasing and Hestle Andrew Johnston, Jr. and their lawyers."

He told the panel that General Motors Corporation "does have an adversity of interest with both Mr. Simmons, Feld Truck Leasing Corporation and Mr. Johnston." It was clear during the three weeks of trial that the attorneys for the plaintiff Simmons and the attorneys for Hestle Andrew Johnston and Feld Truck Leasing Corporation were making common cause against General Motors. In his argument to the jury the counsel for General Motors Corporation pointed out to the jury that he was given as much time to argue as was the counsel for Johnston and Feld and Simmons together and told them that all along this has been a case of Feld Truck Leasing, Hestle Andrew Johnston and Mr. Simmons against General Motors Corporation. "That is what it really has been from the beginning and what it is now and what you have not been told is why."

The evidence does not sustain the contention that the trial was materially unfair by reason of the fact that the jury was not informed that a settlement had been reached between Feld and Johnston and Simmons.

General Motors also contends that the agreement was relevant and material to impeach the testimony of Curtis Lee Simmons and Hestle Andrew Johnston, Jr. The agreement would have but little value to the jury in testing the credibility of those parties as witnesses. Both parties were suing General Motors. No issues bearing on the liability of either Johnston or Feld Truck Leasing to Simmons were submitted to the jury. It is possible that the fact that Johnston had been released from liability by reason of the accident by Simmons would be of some help to the jury in assessing his veracity. It must be noted, however, that Johnston would not share in any recovery made by Simmons against General Motors. The value of this information to the jury in assessing the credibility of Johnston must be weighed against the harm which might result to other parties to the suit if the jury was informed of the fact that an apparently substantial settlement had been reached by the other parties and paid to Simmons. For many years it has been the rule in Texas that the fact and amount of settlement agreements should not be admitted into evidence. *Myers v. Thomas,* 143 Tex. 502, 186 S.W.2d 811 (1945); *Johnson v. Willoughby,* 183 S.W.2d 201 (Tex.Civ.App.—Ft. Worth 1944, error ref.).

In *Skyline Cab Co. v. Bradley,* 325 S.W.2d 176 (Tex.Civ.App.—Houston 1959, error ref. n. r. e.), this court upheld the action of the trial court in refusing to permit a settlement agreement to be introduced into evidence for the purpose of showing the motivation of all the parties and their counsel. In so doing we said:

"It would have been prejudicial to Mrs. Bradley's cause of action against the appellants for the Court to have permitted appellants to show that Mrs. Bradley had settled with Mrs. Foster or the insurance company carrying liability insurance for Mrs. Foster. The release in question, which was presented to the Court out of the presence of the jury, shows that the settlement was by the liability insurance carrier of Mrs. Foster . . . The law is well settled in Texas that compromise settlements between a plaintiff and a third party are not admissible in an action by the plaintiff against a defendant allegedly liable where the party offering the settlement does not admit liability . . . ."

There was no secret collusion between the attorneys for Feld and Johnston and for Simmons. There is little support in the record for the contention that the attorney for Feld and Johnston concerned himself in a significant manner with the question of the amount of damage suffered by Mr. Simmons. Under these circumstances it ap-

pears that the harm which might have been suffered by General Motors is clearly outweighed by the harm which surely would have been suffered by the plaintiff had the fact of the settlement been made known to the jury. The trial court did not err in refusing to admit the settlement agreement into evidence.

General Motors contends that the trial court erred in submitting Special Issues Nos. 4 and 7 relating to "sole proximate cause". These points must be sustained.

General Motors has filed a cross-action against Feld and Johnston for contribution and indemnity, alleging that the negligent manner in which Johnston drove the Feld truck was a proximate cause, and the sole proximate cause, of the accident on January 3, 1972; and, that therefore, Johnston's negligence was a proximate cause of Curtis Lee Simmons' injuries.

Defendants Johnston and Feld stated in their second amended third party action that they had a liability to Simmons for some damages. Counsel for Johnston stipulated that the manner in which Johnston drove the truck constituted negligence.

In order to establish that an actor's negligent act is a proximate cause of an injury it is necessary to prove only that as a person of ordinary intelligence and prudence, he should have anticipated the danger to others created by his negligent act. The rule does not require that he anticipate just how injuries will grow out of that dangerous situation. *Biggers v. Continental Bus System,* 157 Tex. 351, 303 S.W.2d 359, 365 (1957).

Since it is admitted that the negligence of Johnston is a proximate cause of the collision, Johnston is responsible in damages for the injuries resulting therefrom, including the injury to the plaintiff's eyes. In view of this admission the conduct of General Motors could not have been a sole proximate cause of the injury to the plaintiff. The legal definition of proximate cause precludes the existence of a new and independent cause. The trial court erred in submitting to the jury issues on sole proxi-

mate cause even though there was evidence that despite the collision the plaintiff would have suffered no injury to his eyes had not the glass in the left front door been defective.

Johnston contends that he did not admit liability for the injury to the plaintiff's eyes. However, injury of that sort was clearly foreseeable as a result of a collision. Insofar as plaintiffs are seeking to hold General Motors liable on a theory of negligence per se, we hold that the negligence, if any, of General Motors was a concurrent act which cooperated with the still persisting original act of Johnston in bringing about the injury. When the new cause or agency concurred with the continuing and cooperating original negligence in working the injury, the original negligence remains a proximate cause of the injury, and the fact that the new concurring cause or agency may not in such case have been reasonably foreseeable does not relieve the wrongdoer of liability. *Bell v. Campbell,* 434 S.W.2d 117 (Tex.1968); *Gulf C. & S. F. Ry. Co. v. Ballew,* 66 S.W.2d 659 (Tex.Com. App., Sec. B, 1933, holdings approved).

The defective glass in the window of plaintiff's automobile was a condition which resulted in injury to the plaintiff's eyes upon being activated by the collision which was caused by Johnston's negligence. Under the doctrine of strict liability General Motors is responsible for the damages suffered by the plaintiff by reason of the finding that the defective condition was a producing cause of the injury. Johnston is liable for the same damages because his conduct was a proximate cause of the collision resulting in the injury. Johnston's negligence was a concurring cause of the damage to the plaintiff's eyes which resulted from the defective glass. Johnston and General Motors were joint tortfeasors. *Koehler v. Pioneer American Ins. Co.,* 425 S.W.2d 889 (Tex.Civ.App.—Ft. Worth 1968, no writ history).

The trial court erred in refusing to disregard the answers to the issues inquiring about sole proximate cause, and in re-

fusing to grant contribution as prayed for by General Motors. It is established in Texas that one tortfeasor may recover full indemnity against his co-tortfeasor if the co-tortfeasor has violated a duty toward him. On the contrary, if the tortfeasors are in pari delicto, the statute requires that each must bear his proportionate share of the burden. *Austin Road Co. v. Pope,* 147 Tex. 430, 216 S.W.2d 563 (1949).

■ General Motors complains of the trial court's action in sustaining objections to the admission of General Motors' Exhibits 34 and 38 through 43 inclusive. Exhibit 34 was a motion picture film and Exhibits 38 through 43, inclusive, were pieces of glass collected from experiments depicted in the film. The trial court refused to admit the film showing the result of certain experiments in breaking glass conducted by an expert witness employed by General Motors. By these experiments General Motors sought to present specific comparisons of the breakage qualities of tempered safety glass and laminated safety glass. While the proffered evidence was both relevant and material, the court's action in refusing to admit it was not erroneous. The trial judge has a considerable discretion in admitting evidence of this sort. Here the trial judge determined that the pictures were largely cumulative of other evidence previously admitted and that the conditions existing at the time of the experiment were not substantially similar to the conditions existing at the time of the accident or occurrence in question. *Pitcock v. B. & W., Inc.,* 476 S.W.2d 83 (Tex.Civ.App.—Houston [1st Dist.] 1971, writ ref. n. r. e.); *Standard Motor Co. v. Blood,* 380 S.W.2d 651 (Tex. Civ.App.—Houston 1964, no writ history); *Hullum v. St. Louis, S. Ry.,* 384 S.W.2d 163 (Tex.Civ.App.—Tyler 1964, writ ref. n. r. e.), cert. den. 382 U.S. 906, 86 S.Ct. 244, 15 L.Ed.2d 159 (1965).

■ The trial court did not err in excluding the testimony of the witness Lawrence Patrick concerning an injury which he personally observed. It appears that this testimony was illustrative of testimony already before the court; the testimony was cumulative in that it had been shown that serious eye injuries could result if the force of a collision was sufficiently strong to cause a person's head to go through the windshield. There was no testimony to the contrary.

■ General Motors contends that the damages awarded by the jury were excessive and that a remittitur should be ordered. In considering this point we are required to exercise sound judicial judgment and discretion in the ascertainment of the amount that would be reasonable compensation for the injuries sustained and to treat the balance as excess. In making this judgment we must determine whether the verdict is supported by a preponderance of the credible evidence. If on consideration of the entire record we find reasonable basis for the jury award, it should not be disturbed. *Green v. Meadows,* 527 S.W.2d 496 (Tex.Civ.App.—Houston [1st Dist.] 1975, writ ref. n. r. e.); *Port Terminal Railway Association v. Macaluso,* 450 S.W.2d 873 (Tex.Civ.App.—Houston [1st Dist.] 1970, no writ).

There is credible evidence that the plaintiff is industrially blind, that he is not able to secure and retain employment. He was employed in a good job and was performing satisfactorily prior to the accident. His work was covered by a union contract which insured that his wage would increase during the term of that contract, and it was reasonably probable that he would receive promotions resulting in a greater wage rate over a period of years. An economist qualifying as an expert testified that the present value of the wages which he had lost and would lose up to the time he reached the age of 65 years was approximately $800,-000.00. There is testimony that he has suffered pain in the past and will suffer pain in the future during the balance of his lifetime. The testimony is that he can no longer engage in many activities which he formerly enjoyed. There is testimony that he has suffered mental pain and anguish. We have carefully considered the entire record of this trial, which lasted three weeks as reflected in the statement of facts

of 32 volumes, and have concluded that the damages awarded to the plaintiff are not excessive.

Other points of error raised by General Motors have been considered and are found not to present reversible error.

While the matter does not seem to have been authoritatively decided in this State it is our opinion that the rule of *Palestine Contractors, Inc. v. Perkins,* 386 S.W.2d 764 (Tex.1964), is applicable in this case even though one party's liability is based on a strict liability theory. The plaintiff contends that we should follow the case of *Heil Co. v. Grant,* 534 S.W.2d 916 (Tex.Civ.App. —Tyler, 1976, writ ref. n. r. e.). In that case the Heil Co. was held liable under a products liability theory and was denied contribution or indemnity from an impleaded defendant. The court, however, found that the Heil Co. had breached a duty to the co-tortfeasor as well as to the plaintiff by the placing of a defective product in the stream of commerce since it sold the defective product to the co-tortfeasor. If General Motors breached a duty which it owed to Feld or Johnston by placing the defective product on the market, then General Motors should not be able to secure contribution from either Johnston or Feld. *Heil Co. v. Grant,* supra; *Vergott v. Deseret Pharmaceutical Co., Inc.,* 463 F.2d 12 (5th Cir. 1972). See also *Gertz v. Campbell,* 55 Ill.2d 84, 302 N.E.2d 40 (1973), and *Herrero v. Atkinson,* 227 Cal.App.2d 69, 38 Cal.Rptr. 490 (1964).

A manufacturer owes a duty to one who is injured by a defective product even though the injured person was not a user or consumer of the product. *Darryl v. Ford Motor Co.,* 440 S.W.2d 630 (Tex.1969). The damages suffered by plaintiff were greatly increased by the defective window. Johnston and Feld became liable for these damages because similar damage could be foreseen as a result of their negligent conduct. The defective product must have been the producing cause of the damage to Johnston and Feld before either of them would be entitled to indemnity against General Motors. The injury which *Johnston* and *Feld* suffered, that is additional liability, cannot

be said to have been produced directly by the breach of General Motors' duty to install reasonably safe glass in the side window of the automobile operated by Simmons. *South Austin Drive-In Theatre v. Thomison,* 421 S.W.2d 933 (Tex.Civ.App.— Austin 1967, writ ref. n. r. e.).

 Since it was admitted that Simmons has settled with Feld and Johnston for damages which he suffered as a result of the negligence of Johnston, the doctrine of *Palestine Contractors, Inc. v. Perkins,* 386 S.W.2d 764 (Tex.1964), is applicable. This case provides that where one joint tortfeasor settles with the injured party and receives a covenant not to sue, the injured party is precluded from recovering more than one-half of his damages from the non-settling joint tortfeasor. The trial court, therefore, erred in entering judgment based on the entire damage found by the jury rather than one-half of that amount only.

The judgment, therefore, is reformed so as to award Simmons a judgment against General Motors in the sum of $500,000.00 together with interest and costs.

Reformed and affirmed.